[Crim. No. 5892. In Bank. Oct. 11, 1956.]

THE PEOPLE, Respondent, v. STEPHEN STUART, Appellant.

John N. Frolich, William Levin and F. Bruce McMullen for Appellant.

Dean M. McCann as Amicus Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, and Edward M. Belasco, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant was charged by information with manslaughter (Pen. Code, § 192) and the violation of section 380 of the Penal Code. He was convicted of both offenses by the court sitting without a jury. His motions for a new trial and for dismissal (Pen. Code, § 1385) were denied, sentence was suspended, and he was placed on probation for two years. He appeals from the judgment of conviction and the order denying his motion for a new trial.

Defendant was licensed as a pharmacist by this state in 1946 and has practiced here since that time. He holds a B.S. degree in chemistry from Long Island University and a B.S. degree in pharmacy from Columbia University. In April, 1954, he was employed as a pharmacist by the Ethical Drug Company in Los Angeles.

On July 16, 1954, he filled a prescription for Irvin Sills. It had been written by Dr. D. M. Goldstein for Sills' 8-day-old child. It called for "sodium phenobarbital, grains eight. Sodium citrate, drams three. Simple Syrup, ounces two. Aqua peppermint, ounces one. Aqua distillate QS, ounces four." Defendant assembled the necessary drugs to fill the prescription. He believed that the simple syrup called for was unavailable and therefore used syrup of orange. The ingredients were incompatible, and the syrup of orange precipitated out the phenobarbital. Defendant then telephoned Dr. Goldstein to ask if he could use some other flavoring. Dr. Goldstein told him that since it was midnight, if he could not find any simple syrup "it would be just as well to use another substance, elixir mesopine, P.B." Defendant spoke to a clerk

and learned that there was simple syrup behind the counter. He mixed the prescription with this syrup, put a label on the bottle according to the prescription, and gave it to Sills. Sills returned home, put a teaspoonful of the prescription in the baby's milk and gave it to the baby. The baby died a few hours later.

Defendant stipulated that there was nitrite in the prescription bottle and that "the cause of death was methemoglobinemia caused by the ingestion of nitrite." When he compounded the prescription, there was a bottle containing sodium nitrite on the shelf near a bottle labeled sodium citrate. He testified that at no time during his employment at the Ethical Drug Company had he filled any prescription calling for sodium nitrite and that he had taken the prescribed three drams of sodium citrate from the bottle so labeled.

On August 11, 1954, another pharmacist employed by the Ethical Drug Company filled a prescription identical with the Sills' prescription. He obtained the sodium citrate from the same bottle used by defendant. The prescription was given to an infant. The infant became ill but recovered. In the opinion of Dr. Goldstein, it was suffering from methemoglobinemia. An analysis of this prescription by a University of Southern California chemist disclosed that it contained 5.4 grams of sodium nitrite per 100 cc's and 4.5 grams of sodium citrate per 100 cc's.

An analysis made by the staff of the head toxocologist for the Los Angeles County coroner of the contents of the bottle given to Sills disclosed that it contained 1.33 drams of sodium citrate and 1.23 of sodium nitrite. An analysis made by Biochemical Procedures, Incorporated, a laboratory, of a sample of the contents of the bottle labeled sodium citrate disclosed that it contained 38.9 milligrams of nitrite per gram of material. Charles Covet, one of the owners of the Ethical Drug Company, testified that on the 17th or 18th of October, 1954, he emptied the contents of the sodium citrate bottle, washed the bottle but not its cap, and put in new sodium citrate. A subsequent analysis of rinsings from the cap gave strong positive tests for nitrite. Covet also testified that when he purchased an interest in the company in April, 1950, the bottle labeled sodium citrate was part of the inventory, that no one had put additional sodium citrate into the bottle from that time until he refilled it after the death of the Sills child and that he had never seen any other supply of sodium citrate in the store.

There is nothing in the record to indicate that the contents of the bottle labeled sodium citrate could have been identified as containing sodium nitrite without laboratory analysis. There was testimony that at first glance sodium citrate and sodium nitrite are identical in appearance, that in form either may consist of small colorless crystals or white crystalline powder, that the granulation of the crystals may vary with the manufacturer, and that there may be a slight difference in color between the two. The substance from the bottle labeled sodium citrate was exhibited to the court, but no attempt was made to compare it with unadulterated sodium citrate or sodium nitrite. A chemist with Biochemical Procedures, Incorporated, testified that the mixture did not appear to be homogeneous but that from visual observation alone he could not identify the crystals as one substance or the other. Defendant testified that he had no occasion before July 16th to examine or fill any prescription from the sodium citrate bottle.

No evidence whatever was introduced that would justify an inference that defendant knew or should have known that the bottle labeled sodium citrate contained sodium nitrite. On the contrary, the undisputed evidence shows conclusively that defendant was morally entirely innocent and that only because of a reasonable mistake or unavoidable accident was the prescription filled with a substance containing sodium nitrite. ■ Section 20 of the Penal Code[1] makes the union of act and intent or criminal negligence an invariable element of every crime unless it is excluded expressly or by necessary implication. (*People* v. *Vogel*, 46 Cal.2d 798, 801 [299 P.2d 850].) Moreover, section 26 of the Penal Code lists among the persons incapable of committing crimes "[p]ersons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent" (subd. 4), and "[p]ersons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." (Subd. 6; see also Pen. Code, §§ 195, 199.) The question is thus presented whether a person can be convicted of manslaughter or a violation of section 380 of the Penal Code in the absence of any evidence of criminal intent or criminal negligence.

The answer to this question as it relates to the conviction

---

[1] "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

of manslaughter[2] depends on whether or not defendant committed an "unlawful act" within the meaning of section 192 of the Penal Code when he filled the prescription. The attorney general contends that even if he had no criminal intent and was not criminally negligent, defendant violated section 26280 of the Health and Safety Code and therefore committed an unlawful act within the meaning of section 192 of the Penal Code.

Section 26280 of the Health and Safety Code provides: "The manufacture, production, preparation, compounding, packing, selling, offering for sale, advertising or keeping for sale within the State of California . . . of any drug or device which is adulterated or misbranded is prohibited."[3] In view of the analysis of the contents of the prescription bottle and the bottle labeled sodium citrate and defendant's stipulation, there can be no doubt that he prepared, compounded, and sold an adulterated and misbranded drug.

 Because of the great danger to the public health and safety that the preparation, compounding or sale of adulterated or misbranded drugs entails, the public interest in demanding that those who prepare, compound, or sell drugs make certain that they are not adulterated or misbranded, and the belief that although an occasional nonculpable offender may be punished, it is necessary to incur that risk by imposing strict liability to prevent the escape of great numbers of culpable offenders, public welfare statutes like section 26280 are not ordinarily governed by section 20 of the Penal Code and therefore call for the sanctions imposed even though the prohibited acts are committed without criminal intent or criminal negligence. (See *People* v. *Vogel, supra,* 46 Cal.2d

---

[2] "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle. . . ." (Pen. Code, § 192.)

[3] "A drug shall be deemed to be adulterated . . . (4) if any substance has been (a) mixed or packed therewith so as to reduce its quality or strength; or (b) substituted wholly or in part therefor." (Health & Saf. Code, § 26235.)

"The term 'misbranded' shall apply to all drugs or devices, the package or label of which bears any statement, design, or emblem regarding such article or the ingredients or substances contained therein which shall be false or misleading in any particular. . . ." (Health & Saf. Code, § 26240.)

798, 801, note 2; Sayre, *Public Welfare Offenses,* 33 Colum. L.Rev. 55, 72-75; Hall, *Prolegomena To A Science of Criminal Law,* 89 U. of Pa.L.Rev. 549, 563-569.)

■ It does not follow, however, that such acts, committed without criminal intent or criminal negligence, are unlawful acts within the meaning of section 192 of the Penal Code, for it is settled that this section is governed by section 20 of the Penal Code. Thus, in *People* v. *Penny,* 44 Cal.2d 861, 877-880 [285 P.2d 926], we held that "there was nothing to show that the Legislature intended to except section 192 of the Penal Code from the operation of section 20 of the same code" and that the phrase "without due caution and circumspection" in section 192 was therefore the equivalent of criminal negligence. ■ Since section 20 also applies to the phrase "unlawful act," the act in question must be committed with criminal intent or criminal negligence to be an unlawful act within the meaning of section 192. By virtue of its application to both phrases, section 20 precludes the incongruity of imposing on the morally innocent the same penalty (Pen. Code, § 193) appropriate only for the culpable. Words such as "unlawful act, not amounting to felony" have been included in most definitions of manslaughter since the time of Blackstone (4 Bl. Comm. Homicide § 191; see Riesenfeld, *Negligent Homicide: A Study in Statutory Interpretation,* 25 Cal.L.Rev. 21-22) and even since the time of Lord Hale, "unlawful act" as it pertains to manslaughter has been interpreted as meaning an act that aside from its unlawfulness was of such a dangerous nature as to justify a conviction of manslaughter if done intentionally or without due caution. (See Moreland, Law of Homicide 186-187, 244, citing 1 Hale, Pleas of the Crown (ed. of 1778) 471-475; Foster, Crown Law (2d ed. 1791) 259; 1 East, Pleas of the Crown (1803) 257.) ■ To be an unlawful act within the meaning of section 192, therefore, the act in question must be dangerous to human life or safety and meet the conditions of section 20. (See *People* v. *Mitchell,* 27 Cal.2d 678, 682-684 [166 P.2d 10]; *People* v. *Pearne,* 118 Cal. 154, 158 [50 P. 376]; *Thiede* v. *State,* 106 Neb. 48 [182 N.W. 570-572, 15 A.L.R. 237]; *People* v. *Pavlic,* 227 Mich. 562 [199 N.W. 373, 374, 35 A.L.R. 741]; *Potter* v. *State,* 162 Ind. 213 [70 N.E. 129, 131, 102 Am.St.Rep. 198, 64 L.R.A. 942]; *State* v. *Cope,* 204 N.C. 28 [167 S.E. 456, 458]; *Dixon* v. *State,* 104 Miss. 410 [61 So. 423, 45 L.R.A.N.S. 219].)

It follows, therefore, that only if defendant had intentionally or through criminal negligence prepared, compounded, or sold an adulterated or misbranded drug, would his violation of section 26280 of the Health and Safety Code be an unlawful act within the meaning of section 192 of the Penal Code. Thus, in *People* v. *Penny, supra,* in discussing section 7415 of the Business and Professions Code, which prohibits the use by licensed cosmetologists of a solution of more than 10 per cent phenol on a human being, we said that had the defendant been a licensed cosmetologist, she would have been guilty of violating section 7415 and therefore of an unlawful act within the meaning of section 192 of the Penal Code. The defendant in that case knew that she was using such a solution. The intentional or criminally negligent use of such a solution on a human being by a licensed cosmetologist in violation of section 7415 of the Business and Professions Code would clearly meet the conditions of section 20 of the Penal Code and would therefore be an unlawful act within the meaning of section 192. When, as in this case, however, the defendant did not know, and could not reasonably be expected to know, that the sodium citrate bottle contained nitrite, those conditions are not met and there is therefore lacking the culpability necessary to make the act an unlawful act within the meaning of section 192.

The crucial question with respect to defendant's conviction under section 380 of the Penal Code[4] is whether he "ignorantly" deviated from Dr. Goldstein's prescription. The attorney general contends that defendant acted "ignorantly" because he did not know and was therefore "ignorant" of the fact that the sodium citrate bottle contained nitrite, and that it is therefore immaterial that he had the professional knowledge that one should have to dispense drugs and could not reasonably be expected to know that the sodium citrate bottle contained nitrite. Defendant, on the other hand, con-

---

[4]At the time defendant filled the prescription section 380 provided: "Every apothecary, druggist, or person carrying on business as a dealer in drugs or medicines, or person employed as clerk or salesman by such person, who, in putting up any drug or medicines, or making up any prescription, or filling any order for drugs or medicines, willfully, negligently, or ignorantly omits to label the same, or puts an untrue label, stamp, or other designation of contents, upon any box, bottle, or other package containing any drugs or medicines, or substitutes a different article for any article prescribed or ordered, or puts up a greater or less quantity of any article than that prescribed or ordered, or otherwise deviates fom the terms of the prescription or order which he undertakes to follow, in consequence of which human life or health is endangered, is guilty of a misdemeanor, or if death ensues, is guilty of a felony."

tends that he did not act "ignorantly," since he had the knowledge of drugs and the technical skills required to dispense them, that he could not reasonably be expected to know that the sodium citrate bottle contained nitrite or to make a chemical analysis of its contents before filling the prescription, and that since there was nothing to show that he lacked the knowledge he was required to have or that he failed to use that knowledge, section 380 does not apply.

A definitive answer to these conflicting contentions cannot be gleaned from the dictionary, on which both parties rely, for the definitions therein can be read to support either contention.[5] "When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted." (*People* v. *Ralph*, 24 Cal.2d 575, 581 [150 P.2d 401].) This rule is particularly pertinent here, where one of the proposed constructions would impose absolute criminal liability and make a felony of an act that involves no culpability whatever. We do not base our decision on that ground alone, however, for we are convinced that it is clear from the history and purpose of section 380 that it did not impose criminal liability without fault.

 Section 380 was enacted in 1872 when anyone could lawfully sell drugs in this state. It was based on section 445 of the Penal Code of New York (1864), and a footnote to that section, adopted by the California Code Commissioners as a note to section 380, stated, "The frequent occurrence of accidents, involving, often, even the loss of human life, through mistakes in putting up prescriptions, render necessary some legislation *to enforce care and caution on the part of dealers in drugs.*" (Italics added.) There was no intimation of a purpose to impose criminal liability without fault, and the qualifying words of the section "willfully, negligently, or ignorantly" belie any such purpose. As the commissioners' note indicates, the legislation was designed to enforce "care and caution" on the part of dealers in drugs. Obviously a

[5]Webster's New International Dictionary, 2d ed. Unabridged, 1948, defines "ignorance" as "want of knowledge in general, or in relation to a particular subject." It defines "ignorant" as "[d]estitute of knowledge; uninstructed or uninformed . . . [u]ninformed (in); *unaware* (*of*); as, I am ignorant in this subject; *he was ignorant of that fact*" and states that "[o]ne is ignorant who is without knowledge, whether in general *or of some particular thing.*" (Italics added.) The italicized words lend support to one contention, the remaining words lend support to the other.

person does not act with "care and caution" who dispenses drugs in ignorance of their properties and proper uses, and we believe that it was to protect the public against such ignorance that section 380 was enacted.

The Legislature's preoccupation with such ignorance is also indicated by its enactment in the same year of the first pharmacy law in this state designed to confine the dispensing of drugs to those of proven knowledge and competency. (Stats. 1871-1872, p. 681.) This law, known as the San Francisco Pharmacy Act, regulated the practice of pharmacy and the dispensing of medicines and poisons in the City and County of San Francisco. It confined the right to dispense drugs or fill prescriptions to graduate pharmacists, licentiates in pharmacy, practicing pharmacists, and practicing assistant pharmacists, and prescribed the educational qualifications and experience that each must have. This act was repealed in 1883, but a state-wide act based thereon was enacted in 1891. (Stats. 1891, p. 86.) Other legislation followed, and in 1937 the present state-wide statute for the protection of the public against ignorance in the handling of drugs was enacted. (Bus. & Prof. Code, §§ 4000-4256, as amended.) In 1955, after the alleged offense herein was committed, the Legislature amended section 380 by deleting the word "ignorantly" and substituting therefor "without consideration of those facts which by use of ordinary care and skill he should have known." This change removed the ambiguity arising from the use of the word "ignorantly" and made it abundantly clear that it was never the purpose of the statute to impose criminal liability without fault for accidents having no relation to a failure to use the knowledge and skill required for the dispensing of drugs. (See *Elbert, Ltd.* v. *Gross,* 41 Cal.2d 322, 327 [260 P.2d 35], and cases cited.)

The judgment and order are reversed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., Spence, J., and McComb, J., concurred.