[No. S074251. Oct 28, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN JOSUEL CORIA, Defendant and Appellant.

870

**COUNSEL**

David E. Roberts for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Carlos A. Martinez, Stan Cross and Catherine G. Tennant, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—In this case, we consider whether the crime of manufacturing methamphetamine requires that the defendant know the character of the substance being manufactured. (See Health & Saf. Code, § 11379.6, subd. (a).) As will appear, we conclude that although defendant may be convicted of the crime without proof that he intended to violate the law, his knowledge of the character of the substance being manufactured is a prerequisite to a conviction under that provision. In short, the Legislature did not intend to create a strict liability offense of manufacturing methamphetamine.

We granted review to settle a conflict between the Court of Appeal opinion in this case and the earlier appellate decision in *People* v. *Telfer* (1991) 233 Cal.App.3d 1194 [284 Cal.Rptr. 913]. After reviewing the applicable statutes and case law, we conclude that the Court of Appeal opinion here, which was authored by Associate Justice (now Presiding Justice) Arthur G. Scotland and concurred in by Presiding Justice Robert K. Puglia (now retired) and Associate Justice Coleman A. Blease, correctly holds that Health and Safety Code section 11379.6, subdivision (a), requires proof that the defendant knew the character of the substance being manufactured. We adopt that opinion as the opinion of this court. (See, e.g., *Arriaga* v. *County of Alameda* (1995) 9 Cal.4th 1055 [40 Cal.Rptr.2d 116, 892 P.2d 150].) With appropriate deletions and additions,[1] that opinion reads as follows:

Defendant Juan Josuel Coria was arrested after he left a clandestine laboratory which was set up for the extraction of pseudoephedrine from cold tablets, a step in the process of manufacturing methamphetamine. Defendant admitted he received $500 for helping others "wash ephedrine pills," but claimed he agreed to do so without knowing this was an illegal act. According to defendant, he initially thought he was helping to salvage "discarded or dirty" pills so they could be resold. When, during the course of the "washing," he learned from the others that it was being done to make methamphetamine, defendant became scared and left.

A jury found him not guilty of conspiring to manufacture methamphetamine (Pen. Code, § 182) and not guilty of possessing pseudoephedrine with the intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)), but convicted him of manufacturing methamphetamine (Health &

---

[1]Brackets together in this manner [ ], without enclosed material, are used to denote our deletions from the opinion of the Court of Appeal; double brackets enclosing material are used to denote our additions. Footnotes in the Court of Appeal opinion that have been retained are sequentially renumbered.

Saf. Code, § 11379.6, subd. (a); further section references are to the Health and Safety Code unless specified otherwise).

On appeal, defendant contends the trial court erred in instructing the jury that, to be guilty of manufacturing methamphetamine in violation of section 11379.6, subdivision (a), it was not necessary for defendant to have been aware it was methamphetamine that was being manufactured via the extraction process.

This instruction was derived from *People* v. *Telfer*[[, *supra*,]] 233 Cal.App.3d 1194 [284 Cal.Rptr. 913], which held that manufacturing of methamphetamine is a strict liability offense, i.e., knowledge of the physical character of the substance being manufactured is not an element of the offense and, "[s]o long as the product of the defendant's activity was methamphetamine . . . , the defendant is guilty, even if he did not know that methamphetamine would be that product." (*Id.*, at p. 1204.)

For reasons that follow, we disagree with the reasoning of *People* v. *Telfer, supra*, 233 Cal.App.3d 1194, which analogized section 11379.6 to strict liability "public welfare" statutes that generally are regulatory in nature, impose light penalties, have little "damage to reputation," and thus have no mens rea requirement. As we shall explain, the crime of manufacturing methamphetamine—a felony punishable by incarceration in state prison—must be interpreted to include as an element of the offense the accused's knowledge of the character of the substance being manufactured. Hence, the trial court's instruction to the contrary was erroneous. As the error was prejudicial, we shall reverse the judgment.

## FACTS

While Officer Lawrence Vila was on surveillance of a residence believed to be a clandestine methamphetamine laboratory, he saw defendant and defendant's brother, Jose Coria, emerge from the garage with a bucket. After defendant rinsed out the bucket, the two men reentered the residence. Two hours later, Vila saw defendant outside the house talking with Coria, Ricardo Flores, and Efrain Palacios. When the conversation ended, Palacios left and the other three men entered the building. Approximately 25 minutes later, Palacios returned, picked up defendant and Coria, and drove away.

A lawful search of what was characterized as a "shed" or a "large shop building at the rear of the residence" revealed the following: cans containing ethyl or denatured alcohol; 44-gallon garbage receptacles containing a cloudy liquid and pseudoephedrine; a large metal cooking pot containing a

cloudy liquid; propane burners; propane tanks; and 80 pounds of pseudoephedrine. Numerous latent impressions of defendant's fingerprints were found on various items, including the metal cooking pot.

Experts opined that the building housed a laboratory used for the extraction of pseudoephedrine from cold tablets, a step in the process of manufacturing methamphetamine. In this step, the cold tablets are mashed, then washed with water or alcohol. The mixture is heated so the water or alcohol will evaporate, leaving pseudoephedrine behind. Hydriotic acid or red phosphorous is then used to convert the pseudoephedrine into methamphetamine.

Evidence indicated that only the extraction of pseudoephedrine was occurring in the building. A criminalist with training and experience in investigating over 200 methamphetamine laboratories testified that, although pseudoephedrine is not a controlled substance, a person who is involved in the extraction of pseudoephedrine from tablets is engaged in the process of manufacturing methamphetamine.

Defendant testified as follows: He agreed to help his brother "wash ephedrine pills" in return for $500. Defendant had seen ephedrine advertised in body building magazines as a "fat loss, muscle sparing agent" used in diets, and assumed they would be washing "discarded or dirty" pills to salvage and resell them. Although he had heard of methamphetamine, he agreed to wash the pills not knowing that methamphetamine was manufactured from pseudoephedrine or ephedrine. He was surprised to find out they were "breaking down pills" to extract the ephedrine. After he had worked at the residence for several hours under the direction of his brother and Flores, defendant asked why they were engaged in "this big production thing just to separate ephedrine from a pill" and why the pill could not be used "exactly like it was . . . ." He was then told they were extracting ephedrine to make methamphetamine. He became scared and said he wanted to go home. Flores agreed to obtain transportation for defendant, telling him he did not have to do any more work. When the transportation arrived, defendant and his brother left. Soon thereafter, law enforcement officers stopped the car and arrested them. Had he known they were going to be involved in the process of manufacturing methamphetamine, he would not have agreed to help wash the pills and would have tried to prevent his brother from doing so.

Defendant's wife testified defendant did not use illicit drugs and had never talked about methamphetamine. A master sergeant who had served with defendant in the Marine Corps testified defendant was an honest and conscientious worker who avoided drinking and was somewhat naive about worldly matters.

DISCUSSION

■ Section 11379.6, subdivision (a) states in pertinent part: "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section 11054, 11055, 11056, 11057, or 11058 shall be punished by imprisonment in the state prison . . . ." (Stats. 1989, ch. 1024, § 1, p. 3546.) The conduct proscribed by this section encompasses the initial and intermediate steps carried out to process a controlled substance. (*People* v. *Lancellotti* (1993) 19 Cal.App.4th 809, 813 [23 Cal.Rptr.2d 640].) In other words, the statute makes it unlawful to engage in the chemical synthesis of a substance as one part of the process of manufacturing a controlled substance.

■ The jury instruction which defines the crime of manufacturing a controlled substance, such as methamphetamine, is CALJIC No. 12.09.1.[2]

At the prosecution's request and over defense counsel's objection, the trial court modified CALJIC No. 12.09.1 to inform the jurors that "[a]wareness of the physical character of the substance being manufactured, i.e., that the product of the chemical synthesis is methamphetamine is not necessary." This modification was based on the holding of *People* v. *Telfer, supra*, 233 Cal.App.3d 1194 (hereafter *Telfer*).

Defendant contends the trial court erred in giving this portion of the instruction, thereby incorrectly converting section 11379.6 into a strict liability crime. He argues it would be anomalous to permit him to be convicted of manufacturing methamphetamine if he did not know methamphetamine was being manufactured, when, absent knowledge of the character of the substance, he could not be convicted of possessing the contraband resulting from the manufacturing process. We agree.

■ In a prosecution for possession of a controlled substance, knowledge of the character of the substance possessed is an essential element of the

---

[2] The variation of CALJIC No. 12.09.1 used by the trial court told the jury: "Defendant is accused in Count 3 of having violated Section 11379.6[, subdivision] (a) of the Health and Safety Code, a crime. [¶] Every person who engages in the process of manufacturing, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, a controlled substance, namely, methamphetamine is guilty of a violation of Section 11379.6[, subdivision] (a) of the Health and Safety Code . . . . [¶] In order to prove such crime, each of the following elements must be proved: [¶] One, a person engaged in the process of manufacturing, either directly or indirectly by means of chemical extraction or independently by means of chemical extraction, two, a controlled substance, namely, methamphetamine."

crime. (*People* v. *Williams* (1971) 5 Cal.3d 211, 215 95 Cal.Rptr. 530, 485 P.2d 1146]; *People* v. *Winston* (1956) 46 Cal.2d 151, 161 [293 P.2d 40].) The requirement that the accused be aware of the character of the substance also applies to crimes of selling or transporting a controlled substance (*People* v. *Daniels* (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232]; *People* v. *Rogers* (1971) 5 Cal.3d 129, 133, 137 [95 Cal.Rptr. 601, 486 P.2d 129]), and to the crime of cultivating marijuana (*People* v. *Gorg* (1955) 45 Cal.2d 776, 780 [291 P.2d 469]).

*Telfer* declined to extend this knowledge requirement to the crime of manufacturing a controlled substance. (233 Cal.App.3d at pp. 1198, 1204.) First, *Telfer* concluded that the language of section 11379.6 does not "condition[] guilt upon knowledge of the physical character of the substance being manufactured. To the contrary, [the Legislature's] failure to include any qualifying words such as 'knowingly' or 'intentionally' indicates that it did not intend that either guilty knowledge or intent would be elements of the offense." ([[233 Cal.App.3d]] at p. 1201.) *Telfer* recognized that such qualifying language is not present in the statutes prohibiting possession, transportation or sale of controlled substances, and that courts nonetheless have interpreted those statutes to require knowledge of the character of the controlled substance. (*Id.*, at pp. 1201-1202.) But *Telfer* believed the rationale of those cases does not apply to the offense of manufacturing a controlled substance. (*Id.*, at pp. 1202-1204.) *Telfer* explained: Some acts are " ' "so destructive of the social order . . . that in the interest of justice the legislature [has imposed strict liability, i.e.,] has provided that the doing of the act constitutes a crime, regardless of knowledge or criminal intent on the part of the defendant. [¶] In these cases it is the duty of the defendant to know what the facts are that are involved or result from his acts or conduct." ' . . ." (*Id.*, at p. 1203, citations omitted.) As examples, *Telfer* cited former statutes regulating prescription drugs. " 'Because of the great danger to the public health and safety that the preparation, compounding or sale of adulterated or misbranded drugs entails, the public interest in demanding that those who prepare, compound, or sell drugs make certain that they are not adulterated or misbranded, and the belief that although an occasional nonculpable offender may be punished[] it is necessary to incur that risk by imposing strict liability to prevent the escape of great numbers of culpable offenders, public welfare statutes like [former sections 26619 and 26620 relating to adulterated drugs] . . . call for the sanctions imposed even though the prohibited acts are committed without criminal intent or criminal negligence.' . . ." (*Id.*, at pp. 1203-1204, citations & fn. omitted.) *Telfer* concluded: "If the production of adulterated but harmless drugs can be punished without showing any guilty knowledge, it is certainly appropriate to apply the same standard to the production of dangerous stimulants such as methamphetamine." (*Id.*, at p. 1204, fn. omitted.)

Consequently, in affirming convictions for manufacturing methamphetamine, *Telfer* held: "Knowledge of the physical character of the substance being manufactured is not an element of section 11379.6. All that the People were required to prove was that the defendant had intentionally engaged in the activity specified in the statute: chemical extraction or chemical synthesis. So long as the product of the defendant's activity was methamphetamine as had been charged, the defendant is guilty, even if he did not know that methamphetamine would be that product." (233 Cal.App.3d at p. 1204.)

*Telfer* thus stands for the proposition that knowledge of the character of the substance being manufactured is not an element of section 11379.6, and that lack of such knowledge is not a defense. Because a person may be guilty of manufacturing methamphetamine without achieving the end product (*People* v. *Lancellotti, supra,* 19 Cal.App.4th at p. 813), the holding of *Telfer,* applied to this case via the challenged instruction, means that defendant was guilty of violating section 11379.6 if he engaged in any step of the manufacturing process, without knowledge that he was engaging in the process of manufacturing methamphetamine, and without actually producing methamphetamine.

For reasons which follow, we reject the *Telfer* holding that section 11379.6 is analogous to strict liability, public health and safety statutes.

■ Generally, " '[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.' . . ." (*People* v. *Simon* (1995) 9 Cal.4th 493, 519 [37 Cal.Rptr.2d 278, 886 P.2d 1271], citations omitted.) In other words, there must be a union of act and wrongful intent, or criminal negligence. (Pen. Code, § 20; *People* v. *Vogel* (1956) 46 Cal.2d 798, 801 [299 P.2d 850].) "So basic is this requirement that it is an invariable element of every crime unless excluded expressly or by necessary implication." (*People* v. *Vogel, supra,* at p. 801, fn. omitted.) In addition, Penal Code section 26 provides that a person is incapable of committing a crime where an act is performed in ignorance or mistake of fact negating criminal intent; a crime cannot be committed by mere misfortune or accident. (*People* v. *Lopez* (1986) 188 Cal.App.3d 592, 597 [233 Cal.Rptr. 207].)

■ There is an exception to the mens rea requirement for certain so-called public welfare crimes. Such offenses generally are based upon the violation of statutes which are purely regulatory in nature and involve widespread injury to the public. (*People* v. *Matthews* (1992) 7 Cal.App.4th 1052, 1057-1058 [9 Cal.Rptr.2d 348].) "Under many statutes enacted for the protection of the public health and safety, e.g., traffic and food and drug

regulations, criminal sanctions are relied upon even if there is no wrongful intent. These offenses usually involve light penalties and no moral obloquy or damage to reputation. Although criminal sanctions are relied upon, the primary purpose of the statutes is regulation rather than punishment or correction. The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement." (*People* v. *Vogel, supra,* 46 Cal.2d at p. 801, fn. 2.)

 It is this public welfare exception upon which *Telfer* relied in concluding that section 11379.6 is a strict liability offense. However, the cases cited by *Telfer* in support of this proposition (233 Cal.App.3d at pp. 1203-1204) involved violations of regulatory statutes imposing misdemeanor penalties. (*People* v. *Stuart* (1956) 47 Cal.2d 167, 172 [302 P.2d 5, 55 A.L.R.2d 705]; *In re Marley* (1946) 29 Cal.2d 525, 526 [175 P.2d 832]; *Brodsky* v. *Cal. State Bd. of Pharmacy* (1959) 173 Cal.App.2d 680 [344 P.2d 68].)

The analogy is inapt. Section 11379.6 is more than a mere regulatory statute which imposes light penalties with no damage to reputation. (See *Staples* v. *United States* (1994) 511 U.S. 600, 618-619 [114 S.Ct. 1793, 1803-1804, 128 L.Ed.2d 608, 624].) Manufacturing methamphetamine is a felony, which is " ' "as bad a word as you can give to man or thing." ' " (*Ibid.*)

The United States Supreme Court has emphasized that felony offenses which bear harsh punishment are not the type of "public welfare" offenses for which courts will readily dispense with the mens rea requirement when construing a statute. (*Staples* v. *United States, supra,* 511 U.S. at pp. 616-617 [114 S.Ct. at pp. 1802-1803, 128 L.Ed.2d at pp. 623-624]; *People* v. *Simon, supra,* 9 Cal.4th at p. 520[[, fn. 17]].)

[[*Telfer, supra,* 233 Cal.App.3d at pages 1203-1204, relied in part on our decision in *People* v. *Stuart, supra,* 47 Cal.2d 167, construing as a strict liability offense a provision (former § 26280) prohibiting the manufacture of adulterated or misbranded drugs or devices. We find the case inapposite. As we stated in *Stuart,* the provision at issue there clearly was aimed at protecting the general public from the distribution of adulterated or mis-branded drugs or devices and was therefore considered an appropriate subject for imposition of strict liability. (*People* v. *Stuart, supra,* 47 Cal.2d at p. 172.) Moreover, *Stuart* ultimately concluded that "only if defendant had intentionally or through criminal negligence prepared, compounded, or sold

an adulterated or misbranded drug, would his violation of section 26280 of the Health and Safety Code be an unlawful act within the meaning of" the manslaughter statute. (*People* v. *Stuart, supra,* 47 Cal.2d at p. 174.)

Although section 11379.6, like any other law relating to narcotics or controlled substances, undoubtedly has public health and safety features, its provisions forbid the manufacture of controlled substances for mere personal use or consumption, as well as for sale or distribution to the public. Moreover, from the standpoint of public health and safety, manufacturing controlled substances appears akin to selling those substances. Yet, as previously noted, our case law holds that if the defendant is prosecuted for *possession or sale* of a controlled substance, his knowledge of the character of the substance possessed is an essential element of the offense. (*People* v. *Daniels, supra,* 14 Cal.3d at p. 860; *People* v. *Williams, supra,* 5 Cal.3d at p. 215.) Logically, a defendant prosecuted for manufacturing those substances should be similarly treated.]]

Moreover, there is a " 'prevailing trend "away from the imposition of criminal sanctions in the absence of culpability where the governing statute, by implication or otherwise, expresses no legislative intent or policy to be served by imposing strict liability." . . .' " (*People* v. *Simon, supra,* 9 Cal.4th at p. 521, citations omitted.) Section 11379.6's silence with respect to a knowledge element does not mean the Legislature intended to dispense with the requirement that the accused know the character of the substance being manufactured. For crimes which impose severe punishment, ". . . the usual presumption that a defendant must know the facts that make his conduct illegal should apply." (*Staples* v. *United States, supra,* 511 U.S. at p. 619 [114 S.Ct. at p. 1804, 128 L.Ed.2d at p. 624].)

For this reason, although criminal statutes prohibiting the possession, transportation, or sale of a controlled substance do not expressly contain an element that the accused be aware of the character of the controlled substance at issue (§§ 11350-11352, 11357-11360, .11377-11379), such a requirement has been implied by the courts. (*People* v. *Daniels, supra,* 14 Cal.3d at p. 860; *People* v. *Rogers, supra,* 5 Cal.3d at p. 133; *People* v. *Gorg, supra,* 45 Cal.2d at p. 780.) For the same reason, the manufacturing statute must be construed to include such a knowledge element. (See also *People* v. *Honig* (1996) 48 Cal.App.4th 289, 327-328 [55 Cal.Rptr.2d 555] [statutes in pari materia should be construed together and harmonized to the extent possible].)

[[We observe that before 1984, the offenses of transporting, selling, and manufacturing controlled substances were included *in a single statute* applying to one who "transports, imports into this state, sells, manufactures,

compounds, furnishes, administers, or gives away . . . any controlled substance . . . ." (Former § 11379, as amended by Stats. 1977, ch. 843, § 24, p. 2536; see also former § 11912, as amended by Stats. 1970, ch. 1098, § 16, p. 1955.) In 1984 and 1985, the Legislature amended section 11379, and in 1985 it adopted section 11379.6, placing the offense of manufacturing controlled substances into a separate section. The sole expressed purpose of the change was "to increase the *penalties* for those who illegally manufacture controlled substances." (Historical and Statutory Notes, 40 pt. 1 West's Ann. Health & Saf. Code (1991 ed.) foll. § 11379.6, p. 626, italics added). The legislative history contains no suggestion whatever that the Legislature intended to treat manufacturing of controlled substances differently than sales or possession, with respect to the requisite criminal knowledge or intent. This analysis leads us to reject the Attorney General's alternative argument that section 11379.6 should be interpreted as a general intent statute, requiring only proof of a general intent to do the proscribed act of manufacturing methamphetamine. (See, e.g., *People* v. *Sargent* (1999) 19 Cal.4th 1206, 1214-1215 [81 Cal.Rptr.2d 835, 970 P.2d 409].) Assuming without deciding that the provision is a general intent crime, that characterization would not preclude construing the provision as requiring knowledge of the character of the drug being manufactured. (See *People* v. *Daniels*, *supra*, 14 Cal.3d at pp. 860-861.)

The Attorney General devotes much of his briefing to authorities (1) construing various statutes as imposing strict criminal liability (see, e.g., *People* v. *Atlas* (1998) 64 Cal.App.4th 523 [75 Cal.Rptr.2d 307] [drug sales near schools]), (2) requiring mere general intent (see *People* v. *Gory* (1946) 28 Cal.2d 450, 453 [170 P.2d 433]), or (3) acknowledging the extreme danger to public health and safety arising from methamphetamine production (see, e.g., *People* v. *James* (1998) 62 Cal.App.4th 244, 271 [74 Cal.Rptr.2d 7]). The weak link in his analysis, of course, is his failure to show that the Legislature intended section 11379.6 to impose criminal liability without knowledge of the character of the manufactured product, unlike similarly phrased California statutes forbidding possession, transport, or sale of controlled substances.]]

We recognize that, in some circumstances, severely enhanced penalties may be imposed absent the accused's knowledge of all the facts bringing his conduct within the prohibition of the statute. For example, courts have upheld penalties for the distribution of illegal drugs within 1,000 feet of a school even in the absence of proof that the accused knew he was within 1,000 feet of a school, and for the possession with the intent to distribute illicit drugs exceeding certain weight limits even in the absence of proof that

the accused knew the drugs exceeded the specified weight limits. (*U.S.* v. *Pitts* (9th Cir. 1990) 908 F.2d 458, 461; *U.S.* v. *Klein* (9th Cir. 1988) 860 F.2d 1489, 1494-1495; [[*People* v. *Sargent, supra,* 19 Cal.4th at pp. 1222-1223; *People* v. *Atlas, supra,* 64 Cal.App.4th at pp. 526-530]]; *People* v. *Meza* (1995) 38 Cal.App.4th 1741, 1748 [45 Cal.Rptr.2d 844].)

This is permissible because the enhancements do not criminalize otherwise innocent activity, since the statutes incorporate the underlying crimes, which already contain a mens rea requirement. (*People* v. *Meza, supra,* 38 Cal.App.4th at p. 1748.) In other words, because it is unlawful to distribute illicit drugs regardless of the amount or location, the accused, by participating in such an illegal transaction, assumes the risk of the enhanced penalties even absent knowledge of the facts bringing his conduct within the enhancement statutes. (*Ibid.*)

In contrast, "where . . . dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct, a severe penalty is a further factor tending to suggest that [the Legislature] did not intend to eliminate a *mens rea* requirement." (*Staples* v. *United States, supra,* 511 U.S. at p. 618 [114 S.Ct. at p. 1804, 128 L.Ed.2d at p. 624].) Such must be the case with the crime of manufacturing methamphetamine. Not all acts of chemical synthesis are illegal; only the manufacture of specific controlled substances is prohibited. (§ 11379.6.) If this were not so, chemistry classes could not be taught at educational institutions. Moreover, the mere possession of pseudoephedrine is not prohibited and punishable by imprisonment absent an intent to manufacture methamphetamine. (§ 11383, subd. (c).) Thus, a person cannot be found guilty of aiding and abetting the crime of manufacturing of methamphetamine absent knowledge of the perpetrator's purpose to manufacture methamphetamine. (*People* v. *Sanchez* (1994) 27 Cal.App.4th 918, 923 [33 Cal.Rptr.2d 155].) In other words, because chemical synthesis ordinarily is "traditionally lawful conduct," we may infer the Legislature did not intend to eliminate a mens rea requirement in section 11379.6 that the accused know of the character of the substance being manufactured.

Simply stated, there is no reason in law or logic to construe section 11379.6 as a strict liability offense and thus permit the conviction of a person for manufacturing methamphetamine, a felony, for extracting pseudoephedrine from pills if the person does not know the extraction was performed for the purpose of, or as part of the process of, manufacturing methamphetamine. Merely engaging in chemical synthesis is not enough; the defendant must have knowledge of the facts which make the chemical synthesis unlawful, i.e., that methamphetamine is being manufactured.

[[*Telfer* suggested that given the specialized nature of the methamphetamine manufacturing process, "The likelihood of anyone innocently manufacturing this substance is remote in the extreme." (*Telfer, supra,* 233 Cal.App.3d at p. 1204, fn. 13.) To the contrary, consistent with defendant's testimony in this case, we find it reasonably likely the principal manufacturers of illicit drugs occasionally may employ naive, unsophisticated, and relatively unskilled helpers to assist in the manufacturing process. Although the Attorney General suggests that requiring knowledge of the substance produced would "create a loophole" for manufacturers of controlled substances, the "loophole" would only benefit the innocent employees, not the manufacturers themselves.]] Because a person is not guilty of manufacturing methamphetamine if he does not know that methamphetamine is the substance being manufactured, the modified version of CALJIC No. 12.09.1 given by the trial court was erroneous.

The error was prejudicial. By telling the jury it did not matter if defendant lacked knowledge that methamphetamine was being manufactured, the instruction [[both removed an element of the charged offense from the jury's consideration (see *People* v. *Flood* (1998) 18 Cal.4th 470, 502-504 [76 Cal.Rptr.2d 180, 957 P.2d 869]), and]] negated his defense that he did not know what actually was going on at the residence, and that he ceased participating in the chemical synthesis and asked to leave when he learned of the true facts.

It is true the jury was instructed regarding a mistake of fact defense (CALJIC No. 4.35). However, this conflicted with the erroneous instruction, upon which the prosecutor placed great emphasis during summation by arguing that defendant's claimed lack of knowledge was a defense only to the charges of conspiracy to manufacture methamphetamine (count I) and possession of pseudoephedrine with the intent to manufacture methamphetamine (count II) but had no application to the charge of manufacturing methamphetamine (count III). According to the prosecutor, because defendant admitted he had taken part in the process of extracting the pseudoephedrine, defendant was guilty of manufacturing methamphetamine and the jury was required to convict him on count III. That the jurors convicted defendant on count III, but found him not guilty on counts I and II, suggests the jury believed his defense but felt constrained to convict him on the charge of manufacturing methamphetamine.

Hence, the instructional error was not harmless, and defendant is entitled to a new trial on count III.

[[Here our quotation of the Court of Appeal opinion ends.]]

## DISPOSITION

We affirm the judgment of the Court of Appeal.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.