[No. C032401. Third Dist. Jan. 31, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL J. PIERSON et al., Defendants and Appellants.

## COUNSEL

Candace Hall, under appointment by the Court of Appeal, for Defendant and Appellant Michael J. Pierson.

James E. McCready, under appointment by the Court of Appeal, for Defendant and Appellant Patrick M. Dougherty.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert A. Anderson, Assistant Attorney General, Stephen G. Herndon and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORRISON, J.**—Defendant Michael J. Pierson was convicted of two counts of manufacturing a controlled substance (Health & Saf. Code, § 11379.6, subd. (a)), and the jury found true the allegation that he committed the second offense while released on bail (Pen. Code, § 12022.1, subd.

(b)). He was sentenced to eight years eight months in state prison. Defendant Patrick M. Dougherty was convicted by jury of manufacturing a controlled substance (Health & Saf. Code, § 11379.6, subd. (a)), and the trial court found true that he had a drug-related prior conviction (Health & Saf. Code, § 11370.2, subd. (c)). He was sentenced to six years in prison.

Both defendants appeal. Pierson contends he was denied effective assistance of counsel when his counsel failed to move to excuse Juror No. 5, the father of a police officer who testified. We find no ineffective assistance of counsel and affirm the judgment as to Pierson.

Dougherty contends there was insufficient evidence to support his conviction, as an instruction allowed the jury to convict based solely on his extraction of ephedrine. He also raises a claim regarding Juror No. 5. We agree that ephedrine, although a precursor to methamphetamine, is not a controlled substance under the applicable statutes. Accordingly, to convict of manufacturing a controlled substance based on ephedrine extraction, the People must prove defendant knew methamphetamine was being manufactured. (*People v. Coria* (1999) 21 Cal.4th 868 [89 Cal.Rptr.2d 650, 985 P.2d 970].) Failing to instruct on this element of the offense was error under both the state and federal Constitutions. (*People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869].) On this record, we cannot say the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) We reverse the judgment as to Dougherty.

### Facts

On September 19, 1997, Officer Marcello Codog was conducting surveillance of Pierson's residence on 51st Street. He contacted Pierson and obtained consent to search his residence, including the garage. Officers found a variety of items in a room in the garage that were consistent with manufacturing methamphetamine. It looked like several things were occurring there, all having to do with various stages of methamphetamine manufacturing. One bag contained iodine, hydriotic acid, ephedrine and red phosphorus, everything needed to make methamphetamine. Pierson was arrested and released on bail.

A forensic chemist explained there are five basic steps to manufacturing methamphetamine. The first is ephedrine extraction in which ephedrine is mixed with wood or methyl alcohol and then poured through a filter to extract the "gunk," the sugars and starches. Second, red phosphorus and iodine are added to the ephedrine. The mixture is then heated. The resulting

mixture is very acidic, so a base, such as Red Devil lye or Drain-O, is added. Then an organic solvent, such as paint thinner, toluene, Coleman fuel or lighter fluid, is added. For the fifth step of product recovery, hydrochloric gas is bubbled through the mixture. This method of methamphetamine manufacture is used in 99 percent of the cases in Sacramento and 90 percent of the cases in California. Under this method, ephedrine or pseudoephedrine are immediate precursors to methamphetamine.

On June 11, 1998, Detective Hill was conducting surveillance of Dougherty's residence at Linda Sue Way at 2:30 a.m. He saw Pierson's pickup truck outside. When Hill returned at 11:00 a.m., the truck was gone. Two garbage cans were out. Hill looked in the garbage cans and saw three empty cans of denatured alcohol and smelled a strong odor of solvent. He tore a hole in the plastic garbage bag and smelled a strong odor of solvent and seized the bag. Inside the bag were empty cans of denatured alcohol, Kingsford lighter fluid, Red Devil lye, wet coffee filters, a glass coffee pot with a milky substance, a broken flask with red powder, a Ziploc bag with white sludge and wet paper towels. Chemical analysis revealed indications of methamphetamine in the postcook stage. A narcotics detective, Mike Rinelli, opined that manufacturing of methamphetamine had occurred, but the production run was not particularly successful.

Hill obtained a search warrant for Dougherty's residence. The residence was empty and Dougherty was found in the backyard. In a shed there was a five-gallon bucket with white sludge and a clear liquid, and numerous containers of the same substance. They all contained ephedrine or pseudoephedrine. Rinelli opined it was an ephedrine extraction lab. Another detective estimated there were approximately five pounds of ephedrine in all the containers.

Hill asked Dougherty if he knew why the officers were searching. Dougherty responded, "I imagine it's because of the ephedrine." He told Hill, "All I know how to do is extract ephedrine, and that's all you're going to find here." Dougherty told the officer the ephedrine was his; he bought a box of pills for $4,500 and had not yet paid for it.

The officers then went to Pierson's residence on White Rock Road. When Hill mentioned Dougherty's name, Pierson became nervous. He consented to a search. Hill found a red duffel bag under the trailer; it was extremely clean. Pierson said it was not his, but he had put it there. Inside were reaction vessels, a heating plate, plastic tubing, pseudoephedrine pills, red phosphorus, iodine, solvent, and an electronic scale. Rinelli opined the bag contained everything necessary for a miniature methamphetamine laboratory. There

was moisture in the glass flasks and moist filter papers, indicating the items had been used in the past 24 hours.

At trial Dougherty denied knowledge of the ephedrine in the shed. He claimed he told Hill about the ephedrine extraction only after Hill threatened to arrest Dougherty's son and girlfriend. His comments to Hill were based on things he overheard the officers say during the search.

Dougherty's attorney asked that the jury be instructed there must be knowledge and intent to manufacture methamphetamine. The prosecutor argued that manufacturing ephedrine, a precursor to methamphetamine, alone was sufficient under Health and Safety Code section 11379.6. The jury was instructed that to violate section 11379.6, a defendant had to manufacture a controlled substance, to wit, methamphetamine or an immediate precursor. An immediate precursor was not defined.

In closing argument, the prosecutor argued the charge was not manufacturing methamphetamine, but manufacturing a controlled substance. Here, there were two controlled substances, methamphetamine and ephedrine, an immediate precursor to methamphetamine.

The discussions about what was necessary to prove manufacturing a controlled substance continued during closing arguments. The trial court ruled Dougherty could not argue there was no crime if he did not know methamphetamine was being manufactured.

## DISCUSSION

## I

During trial the prosecutor discovered additional fingerprints had been lifted from items seized from Dougherty's residence. The identification technician testified one of the prints was lifted by Officer Lopes. Juror No. 5 informed the court that Officer Lopes was his son. The court questioned Juror No. 5 about his ability to decide the case if his son was a witness. The prosecutor determined that she did not need the evidence of the print Lopes lifted and offered to strike the testimony. Pierson would not agree to striking the testimony. Officer Lopes's testimony about the fingerprint was presented by Pierson.

Dougherty's attorney raised the issue of excusing Juror No. 5 again during Dougherty's testimony. That testimony revealed a conflict between Dougherty and Officer Hill, regarding Dougherty's comments to Hill during the

search of his residence. Since Officer Lopes was on the same team as Hill, Dougherty asked that Juror No. 5 be excused. The prosecutor opposed the motion and Pierson simply submitted the issue. The trial court decided not to replace Juror No. 5. It found Lopes's testimony was not controversial (Dougherty admitted he touched the item), and counsel knew of the conflict between Hill and Dougherty's stories "from almost day one."

Pierson contends he was denied effective assistance of counsel when his counsel failed to move to excuse Juror No. 5. In his analysis he assumes counsel had a tactical reason for retaining Juror No. 5, a belief he was a better juror than the alternate. He argues that even if counsel had a tactical reason, such decision was not reasonable because it "implicated the freedom of deliberation of the whole jury." He asserts that although counsel may have reasonably concluded Juror No. 5 could be a fair and impartial juror, his presence on the jury necessarily chilled the jurors' discussion of the officers' credibility. The officers' credibility was at issue not only in determining the circumstances under which Dougherty made his comments to Hill, but also in reconciling the testimony about count one. The chemist testified manufacturing methamphetamine would produce odors, but no neighbors reported any odors. Officer Michaels concluded that manufacturing had occurred at Pierson's residence based on the combination of certain chemicals. The chemist admitted he could not tell when the chemicals were placed in solution and they could have been brought to that location in that state. Pierson's defense was that the items indicating methamphetamine manufacture were brought to his garage from someone else's residence after an arrest.

During voir dire Juror No. 5 disclosed that he had two sons who were Sacramento County police officers, one for the police department and one for the county sheriff. It was known that several officers would be testifying in this case. Apparently, neither defense counsel felt that the father of two police officers would chill the jury's discussion of officer credibility. Pierson does not challenge counsel's conduct in retaining Juror No. 5 at the outset. Instead, he asserts that the chilling effect only arose once Juror No. 5's son testified. Pierson's argument is not persuasive. The credibility of Juror No. 5's son was not challenged; indeed, it was Pierson who offered the testimony. The conflicting testimony of Dougherty and Hill did not affect Pierson. Further, there was no evidence of any connection between Lopes and Officer Craig Michaels, the officer whose credibility Pierson challenged, other than that they were both police officers, a fact known before Lopes testified.

"In evaluating a defendant's claim of deficient performance by counsel, there is 'a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citation.] Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "[T]he decision whether to accept a jury as constituted is obviously tactical, and nothing on the appellate record demonstrates counsel's tactical choice here was either unreasonable or prejudicial." (*People v. Lucas* (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373].) There is no basis for second-guessing counsel's trial strategy in retaining Juror No. 5.

## II

 Dougherty's first argument is somewhat confusing. His heading indicates his argument is that the evidence was insufficient to support his conviction for manufacturing a controlled substance. This contention has no merit. Pierson's truck was seen at Dougherty's one night. The next morning, garbage, containing evidence of manufacturing methamphetamine, was placed in front of Dougherty's residence. A letter addressed to Dougherty was found in the garbage. An ephedrine extraction lab was found in Dougherty's shed. The same day, Pierson was found with a bag containing all the items necessary to manufacture methamphetamine. Moisture on a few of the items indicated recent use. This evidence is sufficient to support a conclusion that Dougherty was involved in manufacturing methamphetamine.

Despite the heading, Dougherty actually argues the trial court erred in instructing the jury that it could accept ephedrine as an immediate precursor to methamphetamine for purposes of Health and Safety Code section 11379.6. As we understand it, Dougherty's argument is that manufacturing ephedrine alone is insufficient to support a conviction for manufacturing a controlled substance. Dougherty is correct.

Under Health and Safety Code section 11379.6, subdivision (a), "every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section 11054, 11055, 11056, 11057, or 11058" is guilty of a felony. In this case, the relevant cross-reference is Health and Safety Code section 11055, which sets forth Schedule II controlled substances. Among the stimulants listed is methamphetamine. (Health & Saf. Code, § 11055, subd. (d)(2).) Subdivision (f) lists immediate precursors: "(f) Immediate precursors. Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances: [¶](1) Immediate precursor to amphetamine

and methamphetamine: [¶](A) Phenylacetone. Some trade or other names: phenyl-2 propanone; P2P; benzyl methyl ketone; methyl benzyl ketone. [¶](2) Immediate precursors to phencyclidine (PCP): . . ."

The only immediate precursor to methamphetamine listed is phenylacetone; ephedrine is not listed. In this case, phenylacetone or P2P was found only as a by-product of methamphetamine manufacturing in the items taken from Pierson's garage, from the garbage outside Dougherty's house, and from the red bag found under Pierson's trailer. It was not found with the ephedrine in the shed. The chemists testified P2P was a by-product in the manufacturing of methamphetamine and could also be used to make methamphetamine; that was a method seen 15 to 20 years ago.

The Attorney General argues subdivision (f) of section 11055 does not limit immediate precursors of methamphetamine to phenylacetone. We disagree. Subdivision (f) of section 11055 defines immediate precursors to methamphetamine, limiting the definition to substances containing phenylacetone. There is no language in the statute that can be interpreted to include ephedrine within immediate precursors. The Legislature was not unaware of ephedrine's role in the manufacture of methamphetamine. Transactions involving ephedrine must be reported (Health & Saf. Code, § 11100), and possession of ephedrine with the intent to manufacture methamphetamine is a felony (Health & Saf. Code, § 11383, subd. (c)).

The trial court instructed the jury, "Every person who manufactures, produces, processes or prepares methamphetamine or an immediate precursor to methamphetamine, those substances being classified as controlled substances, either directly or indirectly by chemical extraction or independently by means of chemical synthesis is guilty of a violation of the Health and Safety Code Section in question." The court further instructed the jury that the person must have knowledge that the substance being manufactured was methamphetamine or an immediate precursor. While these instructions may be correct in the abstract, it was error to instruct on a precursor in this case, as there was no evidence to support such an instruction.

The term "immediate precursor to methamphetamine" has a technical legal meaning under Health and Safety Code section 11055, subdivision (f), and it is limited to substances containing phenylacetone. As there was no evidence that a substance containing phenylacetone, other than methamphetamine, was being manufactured, there was no need to instruct on manufacturing an immediate precursor. In so instructing, the trial court allowed the prosecutor to argue that ephedrine, as a precursor to methamphetamine, was a controlled substance, and that Dougherty was guilty if he manufactured

ephedrine and knew it was a precursor to methamphetamine. Neither is the law.

As the Attorney General points out, extracting ephedrine as the first step in manufacturing methamphetamine is a violation of Health and Safety Code section 11379.6. "The conduct proscribed by this section encompasses the initial and intermediate steps carried out to process a controlled substance. [Citation.] In other words, the statute makes it unlawful to engage in the chemical synthesis of a substance as one part of the process of manufacturing a controlled substance." (*People v. Coria, supra,* 21 Cal.4th 868, 874.) The crime, however, is not a strict liability offense. "Merely engaging in chemical synthesis is not enough; the defendant must have knowledge of the facts which make the chemical synthesis unlawful, i.e., that methamphetamine is being manufactured." (*Id.* at p. 880.) Dougherty requested an instruction on this knowledge; it was denied. This denial removed an element of the charged offense from the jury's consideration. (*Id.* at p. 881.)

The trial court was apparently struggling with how to instruct the jury on the issue of ephedrine extraction in this case. We suggest that in these circumstances, the trial court instruct the jury as follows:

**In this case, defendant is charged with manufacturing a controlled substance. Methamphetamine is a controlled substance. Ephedrine and pseudoephedrine are not controlled substances.**

**In order to be guilty of the crime of manufacturing a controlled substance, it is not necessary that the process of manufacturing be completed. Rather, the crime is committed when a person knowingly participates in the initial or intermediate steps carried out to process a controlled substance. Thus, it is unlawful for a person to engage in the synthesis, processing, or preparation of a chemical used in the manufacture of a controlled substance, even if the chemical is not itself a controlled substance, provided the person knows that the chemical is to be used in the manufacturing of a controlled substance.**

The trial court's misinstruction on manufacturing a precursor and the knowledge required resulted in several serious errors. First, it omitted an element of the offense from the jury's consideration. Second, it allowed the prosecutor to argue, erroneously, that ephedrine was a controlled substance. Third, it precluded Dougherty from arguing that there was no crime if he had no knowledge that methamphetamine was being manufactured. Since we find the first error requires reversal, we need not analyze the prejudicial effect of the other errors.

■ "Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood, supra,* 18 Cal.4th 470, 479-480.) Under the federal Constitution, instructional error that omits an element of an offense is subject to review under the standard of *Chapman v. California, supra,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People v. Flood, supra,* 18 Cal.4th at p. 503.) "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828 17 L.Ed.2d 705, 710-711].)

■ In *People v. Flood, supra,* 18 Cal.4th 470, the defendant was charged and convicted of evading a vehicle operated by a pursuing peace officer resulting in serious bodily injury (Veh. Code, § 2800.3). The trial court failed to submit to the jury the question of whether Officers Bridgeman and Gurney were peace officers. The Supreme Court found this error harmless under *Chapman* because the issue was uncontested and effectively conceded by the defendant; it involved a peripheral element of the offense; it was established by overwhelming, undisputed evidence; and it had nothing to do with the defendant's actions or mental state. (*People v. Flood, supra,* at p. 507.)

The same cannot be said here. Dougherty did contest that he knew or was in any way connected to the manufacture of methamphetamine. His defense was that he went to bed at 1:00 a.m., leaving Pierson alone, and that Pierson knew he would be gone most of the next day. The issue of knowledge was not a peripheral element; it was central. While there was evidence tying Dougherty to the manufacture of methamphetamine—the large amount of ephedrine being extracted in his shed, the evidence of manufacture in the garbage outside his house that included a letter addressed to him, and Pierson's presence at his house the night before he was found with a miniature methamphetamine lab showing signs of recent use—this evidence was not undisputed and it was not overwhelming on the issue of knowledge.

Nor is this a case that falls within the *Cantrell-Thornton* exception (*People v. Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People v. Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]). ■ Under the *Cantrell-Thornton* exception, the error of removing an element of the offense from the jury's consideration "may be found harmless, for federal constitutional purposes, in circumstances in which the parties recognized the omitted element was at issue, presented all evidence at their command on that issue, and the record not only establishes the element as a

matter of law but shows the contrary evidence not worthy of consideration." (*People v. Flood, supra,* 18 Cal.4th at p. 506.) ■■■ Here, the parties did not recognize the omitted element was at issue. While Dougherty argued that manufacturing methamphetamine was a crime only when accompanied by the knowledge and intent to manufacture methamphetamine, the prosecutor vehemently disagreed. The trial court accepted the prosecutor's position and prevented Dougherty from arguing he was not guilty if he did not know methamphetamine was being manufactured. While we might doubt that a reasonable jury could conclude Dougherty was extracting five pounds of ephedrine without knowledge that methamphetamine was being manufactured, particularly after convicting Pierson of manufacturing, Dougherty was not permitted to argue that scenario to the jury. Because he was not allowed to present a full defense, we cannot declare the instructional error to be harmless beyond a reasonable doubt.

## DISPOSITION

As to Pierson, the judgment is affirmed. As to Dougherty, the judgment is reversed

Sims, Acting P. J., and Callahan, J., concurred.