[No. S113433. Jan. 15, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
LISA ROBIN MCCALL, Defendant and Appellant.

COUNSEL

Rebecca P. Jones, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, J. Robert Jibson, Janet E. Neeley and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—A jury convicted defendant Lisa Robin McCall of possession of hydriodic acid with intent to manufacture methamphetamine in violation of Health and Safety Code section 11383, subdivision (c)(2)[1] (section 11383(c)(2)), even though no hydriodic acid was recovered from her residence. The conviction was based upon (1) evidence that defendant possessed sufficient quantities of red phosphorus and iodine to manufacture hydriodic acid, and (2) the court's instruction, pursuant to former section 11383, subdivision (f) (section 11383(f); see fn. 17, *post*), that possession of red phosphorus and iodine, with the intent to manufacture methamphetamine, shall be deemed to be possession of hydriodic acid with the intent to manufacture methamphetamine.

The Court of Appeal reversed the resulting judgment. It stated that the "shall be deemed" language of section 11383(f) allowed the prosecution to obtain a conviction under section 11383(c)(2) simply by proving the basic fact of possession of red phosphorus and iodine. Thus, said the court, section 11383(f) created an improper mandatory presumption because it relieved the prosecution of its burden of proving the ultimate fact of possession of hydriodic acid. We granted the Attorney General's petition for review to determine whether the Court of Appeal correctly characterized section 11383(f). We hold that the language in question creates no presumption at all, but is simply a valid exercise of the Legislature's power to create substantive law and define crimes.

---

[1] All statutory references are to the Health and Safety Code unless otherwise indicated.

## I. PROCEEDINGS BELOW

### A. *Underlying Facts*

During a search of defendant's cabin, sheriff's deputies recovered, among other items, boxes of ephedrine tablets, sinus medication containing pseudoephedrine, red phosphorus, and iodine crystals, as well as the type of equipment used to manufacture methamphetamine. By-products of the ephedrine/hydriodic method of methamphetamine manufacture were found,[2] but no hydriodic acid was recovered.

Defendant was arrested and charged, in count 3, with possession of hydriodic acid with intent to manufacture methamphetamine, a violation of sections 11383(c)(2) and 11383(f). Section 11383(c)(2) provides, "Any person who, with intent to manufacture methamphetamine . . . possesses hydriodic acid . . . is guilty of a felony and shall be punished by imprisonment in the state prison for two, four, or six years." Section 11383(f) provided that "possession of immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . shall be deemed to be possession of the derivative substance. Additionally, possession of essential chemicals sufficient to manufacture hydriodic acid, with intent to manufacture methamphetamine, shall be deemed to be possession of hydriodic acid."

### B. *The Jury Trial*

At trial, the People's first expert witness, Kevin Larson, a special agent with the California Department of Justice, Bureau of Narcotics Enforcement, explained that the ephedrine/hydriodic acid method of methamphetamine manufacture was the prevalent method of manufacture in Northern California. In this method, methamphetamine manufacturers extract pseudoephedrine from cold tablets and add hydriodic acid. He added that hydriodic acid is itself a controlled substance that is difficult to purchase, so manufacturers typically manufacture their own by heating red phosphorus and iodine in water, which causes the iodine to turn into hydriodic acid. The pseudoephedrine and hydriodic acid are then combined to manufacture methamphetamine.

Barry Miller, a criminalist with the California Department of Justice, added that ephedrine can also be extracted from cold tablets and combined with hydriodic acid to manufacture methamphetamine.[3] He testified that ephedrine

---

[2] The ephedrine/hydriodic acid method of methamphetamine manufacture is described *post*, at page 180.

[3] While the essential chemicals remain the same, methamphetamine can also be manufactured by mixing ephedrine, red phosphorus and iodine together and heating the mixture (see,

is the immediate precursor of methamphetamine and that iodine is the immediate precursor of hydriodic acid. He offered the opinion that defendant's cabin contained a laboratory to manufacture methamphetamine using the ephedrine/hydriodic acid method, and that the cabin also contained a sufficient quantity of pseudoephedrine, red phosphorus, and iodine to manufacture methamphetamine.

The court instructed the jury that "Every person who, with the intent to manufacture methamphetamine or . . . hydriodic acid, . . . possesses at the same time . . . red phosphorus and iodine, is guilty of a violation of Health and Safety Code section 11383(c)(1) [*sic*: (c)(2)], a crime. [¶] In order to prove this crime, each of the following elements must be proved: [¶] A person possessed at the same time . . . red phosphorous and iodine; and [¶] That person had the specific intent to manufacture methamphetamine . . . . [¶] And further, for the purpose of this section, possession of immediate precursors . . . sufficient for the manufacture of hydriodic acid with the intent to manufacture methamphetamine, shall be deemed to be in possession of hydriodic acid." The verdict form reflects that defendant was thereafter convicted of a violation of "Section 11383(c)(2)/11383(f)."

### C. *The Court of Appeal Opinion*

The Court of Appeal stated that the court's instructions effectively told the jury that "it must find defendant possessed hydriodic acid if it found she possessed the precursors of hydriodic acid, namely, red phosphorus and iodine." The Court of Appeal held that the "shall be deemed" language of section 11383(f) created the type of mandatory presumption found unconstitutional in *Ulster County Court v. Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213] (*Ulster County*) because the jury was not free to reject the inference of the ultimate fact of possession of hydriodic acid once it found the basic fact of possession of red phosphorus and iodine.

While the Court of Appeal acknowledged that a mandatory presumption may be constitutional if proof of the basic fact or facts supports the inference of guilt beyond a reasonable doubt, it held that such proof was lacking here: "while there is a rational basis to conclude that red phosphorus and iodine are the essential chemicals of hydriodic acid, there is no basis to conclude that those two essential chemicals constitute hydriodic acid [because hydriodic acid] is a different substance which does not come into existence until it is synthesized from its essential components under a process of heat."[4] We disagree.

---

e.g., *People v. Pierson* (2001) 86 Cal.App.4th 983, 986 [103 Cal.Rptr.2d 817]), or, as Criminalist Barry Miller testified, by mixing ephedrine, red phosphorus and hydriodic acid together and heating the mixture.

[4] Both the trial court and Court of Appeal used the section 11383(f) phrases "immediate precursors" and "essential chemicals" interchangeably, which is technically incorrect. A

## II. Discussion

### A. *Presumptions*

#### 1. *Mandatory and Permissible Rebuttable Presumptions*

"[P]resumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic' facts." (*Ulster County, supra,* 442 U.S. at p. 156.)

The term "presumption" is defined in section 600, subdivision (a) of the Evidence Code: "A presumption is an assumption of [an ultimate or elemental] fact that the law requires to be made from [an evidentiary or basic] fact or group of [such] facts found or otherwise established in the action. A presumption is not evidence." Put differently, presumptions "are conclusions that the law requires to be drawn (in the absence of a sufficient contrary showing) when some other fact is proved or otherwise established in the action." (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) [enacting Evid. Code] reprinted at 29B pt. 2, West's Ann. Evid. Code (1995 ed.) foll. § 600, p. 3.)

■ This statutory definition of a "presumption" is incomplete, however, because the law also recognizes the permissive presumption, "which allows— *but does not require*—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." (*Ulster County, supra,* 442 U.S. at p. 157, italics added.) Thus, Evidence Code section 600, subdivision (a) defines a *mandatory* presumption, which "tells the trier that he or they *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." (*Ulster County,* at p. 157.)

■ Evidence Code section 600, subdivision (b) defines the term "inference" and provides: "An inference is a deduction of fact that may logically and

---

"precursor" is "[t]hat which precedes another or from which another is derived, applied especially to . . . a chemical substance that is built into a larger structure in the course of synthesizing the latter." (Stedman's Medical Dict. (27th ed. 2000) p. 1437.) Thus, Criminalist Barry Miller testified that ephedrine is the immediate precursor of methamphetamine and that hydriodic acid is not a precursor of methamphetamine, but is the essential chemical that enables ephedrine to transform into methamphetamine. He also testified that red phosphorus and iodine are not precursors of methamphetamine. He stated that iodine, however, is a precursor of hydriodic acid because in making hydriodic acid from red phosphorus and iodine, the red phosphorus is not itself converted in any way, but instead is the essential chemical that enables the iodine to transform into hydriodic acid.

reasonably be drawn from another fact or group of facts found or otherwise established in the action." Like a presumption, "an inference is not itself evidence; it is the result of reasoning from evidence." (Assem. Com. on Judiciary, com. on Assem. Bill No. 333 (1965 Reg. Sess.) [enacting Evid. Code] reprinted at 29B pt. 2, West's Ann. Evid. Code, *supra*, foll. § 600, p. 4.) There is no substantive difference between the "inference" defined in Evidence Code section 600, subdivision (b) and the "permissive presumption" defined by the high court in *Ulster County*.[5]

██ In addition, the mandatory and permissive presumptions contemplated by Evidence Code section 600 are rebuttable. As provided in Evidence Code section 601, "A presumption is either conclusive or rebuttable. Every [mandatory or permissible] rebuttable presumption is either (a) a presumption affecting the burden of producing evidence or (b) a presumption affecting the burden of proof."[6]

██ In other words, whether the fact finder may find the elemental fact upon proof of the basic fact (a permissive presumption) or must find the elemental fact upon proof of the basic fact (a mandatory presumption), the defendant has the opportunity to rebut the presumed connection between the basic and ultimate facts. (See *Ulster County*, *supra*, 442 U.S. at p. 157.) In deciding whether a rebuttable presumption in a criminal case is mandatory or permissive, "the jury instructions generally will be controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." (*Ibid.*)

██ Because a mandatory rebuttable presumption "tells the trier of fact that he or they *must* find the elemental fact upon proof of the basic fact, at least until the defendant has come forward with some evidence to rebut the presumed connection between the two facts," it is a "troublesome" evidentiary device in a criminal case since the prosecution bears the burden of establishing guilt beyond a reasonable doubt. (*Ulster County*, *supra*, 442 U.S. at p. 157.) The prosecution "may not rest its case entirely on a [mandatory rebuttable] presumption unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt." (*Id.* at p. 167.)

---

[5] See *Ulster County*, *supra*, 442 U.S. at page 157: "The most common evidentiary device is the entirely *permissive inference or presumption*, which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one . . . ." (Italics added.) See also Harris, *Constitutional Limits on Criminal Presumptions as an Expression of Changing Concepts of Fundamental Fairness* (1986) 77 J. Crim. L. & Criminology 308, 335 (" 'Permissive presumptions' are not really presumptions at all. Instead, they are simply inferences drawn from evidence. They do not shift the prosecution's burden of production, and the jury is not required to abide by them. An instruction about a 'permissive presumption' is really an instructed inference. (Fn. omitted.)") For ease of analysis, we will refer to an inference as a permissive presumption.

[6] Conclusive presumptions are discussed *post*, at pages 184–187.

In *People v. Roder* (1983) 33 Cal.3d 491 [189 Cal.Rptr. 501, 658 P.2d 1302] (*Roder*), we construed the mandatory rebuttable presumption contained in Penal Code section 496, which informed the jury that if it found that the defendant was a dealer in secondhand merchandise who bought or received stolen property under circumstances that should have caused him to make a reasonable inquiry of the seller's legal right to sell the same, it shall presume *the defendant bought or received such property knowing it to be stolen,* unless from all the evidence it had a reasonable doubt that the defendant knew the property was stolen. (*Roder*, at pp. 495–496.) We stated that this was "a classic example" of a mandatory rebuttable presumption, "for it 'tells the trier [of fact] that he or they *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts.' " (*Id.* at p. 501, quoting *Ulster County, supra,* 442 U.S. at p. 157.) Echoing the high court in *Ulster County,* we held that a mandatory rebuttable presumption is "reconcilable with the prosecution's burden of proof . . . only if the basic fact proved *compels* the inference of guilt beyond a reasonable doubt." (*Roder, supra,* 33 Cal.3d at p. 498, fn. 7.)[7]

## 2. *Conclusive Presumptions*

As noted, Evidence Code section 601 classifies presumptions as "either conclusive or rebuttable." Evidence Code section 620 provides that all "presumptions established by this article and all other presumptions declared by law to be conclusive, are conclusive presumptions."[8] For example, Evidence Code section 622 provides that "[t]he facts recited in a written instrument are conclusively presumed to be true as between the parties thereto . . . but this rule does not apply to the recital of a consideration." Elections Code section 2026 provides that "[t]he domicile of a Member of the Legislature or a Representative in the Congress of the United States shall be conclusively presumed to be at the residence address indicated on that person's currently filed affidavit of registration." In fact, there are over 150 California civil statutes that utilize the term "conclusively presumed" within the statutory definition.[9]

---

[7] To save its constitutionality, we held that the mandatory rebuttable presumption of Penal Code section 496 should be construed as a legislatively prescribed rebuttable permissive presumption on retrial. (*Roder, supra,* 33 Cal.3d at pp. 505–506.)

[8] The article referred to in Evidence Code section 620 is article 2, entitled Conclusive Presumptions. Article 2 contains Evidence Code sections 620, 622, 623, and 624.

[9] There is but one conclusive presumption in the Penal Code: Penal Code section 1016, which provides that "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged . . . ."

Unlike mandatory rebuttable presumptions and permissive rebuttable presumptions, the conclusive presumptions contemplated by Evidence Code section 620 are irrebuttable by definition, prompting Witkin to say: "[A] conclusive or indisputable presumption is entirely different from the ordinary rebuttable presumption: [N]o evidence may be received to contradict it. Hence, it is more accurately described as a rule of substantive law rather than of evidence. [Citations.]" (1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 160, p. 301.)

Wigmore took a dim view of the term "conclusive presumption": "In strictness there cannot be such a thing as a 'conclusive presumption.' Wherever from one fact another is said to be conclusively presumed, in the sense the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule is really providing that where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of the proponent's case; and to provide this is to make a rule of substantive law and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with evidence." (9 Wigmore, Evid. (Chadbourn rev. ed. 1981), § 2492, pp. 307–308, fn. omitted.)[10] Our court has adopted the Wigmore view. (See *People v. Dillon* (1983) 34 Cal.3d 441, 474 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*).)

Moreover, our court has repeatedly rejected defendants' attempts to invoke the term conclusive presumption as a means to challenge the constitutionality of criminal law statutes. For example, in *Dillon, supra*, 34 Cal.3d 441, a case decided after *Ulster County*, the defendant argued the felony-murder rule created an unconstitutional "conclusive presumption" by relieving the People of its burden to prove malice upon proof of the defendant's intent to commit the underlying felony. (*Dillon*, at p. 472.)

We disagreed and stated: "We are led astray if we treat the 'conclusive presumption of malice' as a true [rebuttable] presumption; to do so begs the question whether malice is an element of felony murder. And to answer that question, we must look beyond labels to the underlying reality of this so-called 'presumption.' [¶] Although the drafters of the Evidence Code chose to perpetuate the traditional distinction between rebuttable and 'conclusive' presumptions (*id.*, §§ 601, 620), they apparently did so in order to emphasize that the code provisions on the topic were largely continuations of prior law. But they were not misled by their own terminology: in their accompanying note the drafters frankly acknowledged that 'Conclusive presumptions are not

[10] Accord, Hoffman, *Thinking About Presumptions: The "Presumption" of Agency from Ownership as Study Specimen* (1997) 48 Ala. L.Rev. 885, 898 ("Careful verbalists have, however, renounced the notion of 'irrebuttable' or 'conclusive' presumptions, recognizing them for what they are: rules of substantive law masquerading as rules of proof.").

evidentiary rules so much as they are rules of substantive law.' [Citation.]" (*Dillon, supra,* 34 Cal.3d at p. 474.) We concluded: " 'Attempts to explain the [felony-murder] statute to the jury in terms of nonexistent "conclusive presumptions" tend more to confuse than to enlighten a jury unfamiliar with the inaccurate practice of stating rules of substantive law in terms of rules of evidence.' " (*Id.* at p. 475.)[11]

Despite the fact that we have maintained that a statute that employs the phrase "shall be conclusively presumed" is simply stating a rule of substantive law (see *Dillon, supra,* 34 Cal.3d at p. 474), there is much confusion regarding the term "conclusive presumption" because it has been incorrectly utilized to describe mandatory rebuttable presumptions.[12]

For example, in *Carella v. California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419] (*per curiam*) (*Carella*), the high court found unconstitutional two California mandatory rebuttable presumptions: (1) the Vehicle Code section 10855 presumption that a person who intentionally fails to return a rented vehicle within five days after the rental agreement expires "shall be presumed to have embezzled the vehicle"; and (2) the Penal Code section 484, subdivision (b) presumption that "[i]ntent to commit fraud is presumed" if a person fails to return, within 20 days after a written demand, personal property rented pursuant to a written contract.

The *Carella* trial court's instructions to the jury, because they contained no rebutting language, erroneously implied that these presumptions were conclusive as to the defendant. Perhaps for this reason, Justice Scalia's concurring opinion in *Carella* refers to the two presumptions as "mandatory conclusive presumptions" (*Carella, supra,* 491 U.S. at p. 268) and as "conclusive presumption[s]" (*id.* at p. 269). But under California law, these two mandatory presumptions are actually rebuttable.[13] While Justice Scalia's

---

[11] Accord, *Burg v. Municipal Court* (1983) 35 Cal.3d 257, 265 [198 Cal.Rptr. 145, 673 P.2d 732] (Veh. Code "section 23152, subdivision (b), does not create a conclusive presumption of intoxication, nor does it 'eliminate[] the prosecution's burden of proof when the accused is found to have [0.10] percent, by weight, of alcohol in [his] blood.' Instead, the statute defines, in precise terms, the conduct proscribed.").

[12] This is not surprising. Various commentators have acknowledged the nettlesome task of properly characterizing presumptions. (See, e.g., Maguire, Evidence: Common Sense and Common Law (1947) 183 [the "word presumption has suffered badly from rough and careless handling"]; Broun, *The Unfulfillable Promise of One Rule for All Presumptions* (1984) 62 N.C. L.Rev. 697, 697 ["The legal term 'presumption' confuses almost everyone who has ever thought about it. That confusion is fully justified. Not only are the concepts represented by the term complex, but courts and legislatures have used the term in many different and often inconsistent ways."]; 2 McCormick on Evidence (5th ed. 1999) § 342, p. 433 ["One ventures the assertion that 'presumption' is the slipperiest member of the family of legal terms, except its first cousin, 'burden of proof.' "].)

[13] Neither Penal Code section 484, subdivision (d) nor Vehicle Code section 10855 contains specific rebutting language; nonetheless, these two presumptions are rebuttable presumptions

characterization is correct insofar as the presumptions were *understood* by the jury, i.e., conclusive in that particular trial, his characterization has created confusion in subsequent cases[14] because a mandatory rebuttable presumption that, due to instructional error, is presumed by the jury to be conclusive in a particular trial is analytically distinct from an Evidence Code section 620 conclusive presumption—the former is unconstitutional under *Ulster County* as an improper mandatory presumption,[15] and the latter simply describes a legislative enactment of substantive law.

### B. *The Proper Characterization of Section 11383(f)*

It is against this backdrop that we analyze defendant's contentions on appeal. Defendant argues that, while the possession of hydriodic acid with intent to manufacture methamphetamine is a crime under section 11383(c)(2), the possession of the essential chemicals of hydriodic acid (red phosphorus and iodine) with intent to manufacture methamphetamine is not a crime under section 11383(c)(2). Therefore, insofar as section 11383(f) deemed the possession of red phosphorus and iodine to be the possession of hydriodic acid, it mandatorily presumed an element of the crime (possession of hydriodic acid) from a noncriminal act (possession of red phosphorus and iodine), and impermissibly lessened the prosecutor's burden of proving all the elements of section 11383(c)(2). Defendant suggests that the only way to avoid this

---

pursuant to Evidence Code section 601 (see discussion, *ante*, at p. 183) and the *Carella* jury should have been so informed.

[14] For example, in *Yates v. Evatt* (1991) 500 U.S. 391, 406, footnote 10 [114 L.Ed.2d 432, 111 S.Ct. 1884] (*Yates*), the high court, citing Justice Scalia's concurring opinion in *Carella*, referred to the presumption in *Carella* as a "conclusive presumption." And, in *Neder v. United States* (1999) 527 U.S. 1, 12 [144 L.Ed.2d 35, 119 S.Ct. 1827], the high court specifically referred to the California Vehicle Code section 10855 presumption at issue in *Carella* as a "conclusive presumption." Our court has not been immune from this misstep. (See, e.g., *People v. Cox* (2000) 23 Cal.4th 665, 677 [97 Cal.Rptr.2d 647, 2 P.3d 1189] [referring to the mandatory rebuttable presumption in *Carella* as a "mandatory conclusive presumption"]; and *People v. Flood* (1998) 18 Cal.4th 470, 504 [76 Cal.Rptr.2d 180, 957 P.2d 869] [referring to the mandatory rebuttable presumption & in *Carella* as an "improper conclusive presumption"].)

[15] In *Yates*, the high court addressed another mandatory rebuttable presumption that was conclusive as to the defendant, but did not, as it did in *Carella*, refer to it as a conclusive presumption. Specifically, the defendant in *Yates* was subject to a mandatory rebuttable presumption, but chose to rest after the People's case-in-chief. He presented no rebutting evidence. The high court observed that "when a mandatory rebuttable presumption is applied in a case with no rebutting evidence, [it] render[s] the presumption conclusive in its operation." (*Yates, supra,* 500 U.S. at p. 406, fn. 10.) The mandatory rebuttable presumptions addressed in *Carella* and *Yates* are analytically indistinct: both operated conclusively in the particular trial—in *Carella* due to instructional error, and in *Yates* due to the defendant's failure to rebut the presumption. We prefer the terminology used in *Yates*: "mandatory rebuttable presumption . . . conclusive in operation."

constitutional infirmity is for the Legislature to enact the separate substantive crime of possession of red phosphorus and iodine with intent to manufacture methamphetamine.

We disagree. Section 11383(f), contrary to defendant's contention, was not phrased in the manner of a mandatory rebuttable presumption: there was no ultimate fact to be presumed from one or more basic facts. Instead, the statute provided that the possession of red phosphorus and iodine with intent to manufacture methamphetamine *shall be deemed* to be possession of hydriodic acid with intent to manufacture methamphetamine. The phrase "shall be deemed," as utilized in section 11383(f), simply created a rule of substantive law; to wit, the possession of red phosphorus and iodine with intent to manufacture methamphetamine was the *legal equivalent* of possession of hydriodic acid with intent to manufacture methamphetamine. Like the term "shall be conclusively presumed," the term "shall be deemed" simply created substantive law.

As the Fifth Circuit stated in *City of New Port Richey v. Fidelity & Deposit Co. of Md.* (5th Cir. 1939) 105 F.2d 348, 351: "We recognize that the legislature cannot make certain [ultimate] facts conclusive proof of another ultimate fact when there is no logical connection or probability in experience to connect them. But the real legislative intent may not be to make a rule of evidence, but a rule of substantive law, and if the legislature may constitutionally do the latter, the form of words used will not defeat the intent. Statutes often say that certain acts 'shall be deemed,' or 'shall be held to be,' or 'shall be conclusively presumed to be' something else which is enjoined or forbidden, when the real purpose and effect is to enjoin or forbid those acts, and not to stultify the courts into really 'deeming' or 'presuming' one thing to be another."

Indeed, the definitional phrase "shall be deemed" is a legislative staple that appears in thousands of California statutes. In the Penal Code alone, the phrase "shall be deemed" appears in over 125 provisions, and is often used, as in section 11383(f), to define one thing in terms of another. For example, Penal Code section 12001, subdivision (j), provides that "For purposes of [Penal Code] Section 12023 ["Every person who carries a loaded firearm with the intent to commit a felony is guilty of armed criminal action"], a firearm shall be deemed to be 'loaded' whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person." In essence, the "shall be deemed" language of Penal Code section 12001, subdivision (j) expands the definition of "loaded" for purposes of Penal Code section 12023.

Penal Code section 627.1 provides that "as used in this chapter" (Access to School Premises), an "outsider" is any person other than a student of the

school, "except that a student who is currently suspended from school shall be deemed an outsider." The "shall be deemed" language here expands the definition of "outsider" to encompass suspended students.

Section 11054, subdivision (a) provides: "The controlled substances listed in this section are included in Schedule I." Methaqualone is *not* one of the substances listed. Section 11150.6 provides: "Notwithstanding . . . subdivision (a) of Section 11054, methaqualone, its . . . isomers, and salts of its isomers shall be deemed to be classified in Schedule I for the purposes of this chapter." The "shall be deemed" language in this instance expands the list of substances included in Schedule I to include methaqualone.

Here, section 11383(f) provided that *"For purposes of this section,"* the "possession of essential chemicals sufficient to manufacture hydriodic acid, with intent to manufacture methamphetamine, *shall be deemed* to be possession of hydriodic acid." (Italics added.) The "For purposes of this section" language of section 11383(f) referred to section 11383(c)(2), which criminalizes the possession of hydriodic acid with intent to manufacture methamphetamine. Section 11383(f), therefore, simply expanded the scope of section 11383(c)(2) to prohibit possession of red phosphorus and iodine with intent to manufacture methamphetamine.

As such, section 11383(f) contained no presumption at all. Instead, section 11383(f) was nothing more than a definitional section that specified the conduct "deemed" criminal "[f]or purposes of" section 11383(c)(2). Section 11383(f) told us that "possession of hydriodic acid," the conduct made criminal by section 11383(c)(2), did not, for purposes of that subdivision, merely carry its lay meaning, but was a term of art that *included* the possession of hydriodic acid's essential chemicals. Substantive due process allows lawmakers broad power to select the elements of crimes, and to define one thing in terms of another. (See *Reno v. Flores* (1993) 507 U.S. 292, 305 [123 L.Ed.2d 1, 113 S.Ct. 1439] [due process requires "no more than a 'reasonable fit'" between legislative ends and means]; *Tracy v. Municipal Court* (1978) 22 Cal.3d 760, 765 [150 Cal.Rptr. 785, 587 P.2d 227] Legislature has broad power to define crimes.)

The legislative history of section 11383(f) supports the view that the Legislature intended to criminalize the possession of red phosphorus and iodine with intent to manufacture methamphetamine.

In 1972, the Legislature enacted the California Uniform Controlled Substances Act (the Act). (Stats. 1972, ch. 1407, § 3, p. 2987 et seq.) Section 11383, as added by the Act, provided that "[a]ny person who possesses both methylamine and phenyl-2-propanone (phenylacetone) at the same time with the intent to manufacture methamphetamine is guilty of a felony . . . ." (Stats. 1972, ch. 1407, § 3, p. 3024.)

In 1977, section 11383 was redesignated as section 11383, subdivision (a). Its substantive language remained unchanged. Section 11383, subdivision (c), the predecessor of section 11383(f), was enacted. It provided: "For purposes of this section, possession of the immediate precursors sufficient for the manufacture of methylamine and phenyl-2-propanone (phenylacetone) . . . shall be deemed to be possession of such derivative substance." (Stats. 1977, ch. 165, § 3.6, p. 640.)

In 1995, section 11383 was expanded to its form at the time of the current offense. (Stats. 1995, ch. 571, § 1, p. 4418.)[16] Section 11383, subdivision (c) was redesignated as subdivision (c)(1), and section 11383(c)(2) was added. The following language was added to section 11383(f), which had provided that "possession of immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . shall be deemed to be possession of the derivative substance": "Additionally, possession of the essential chemicals sufficient to manufacture hydriodic acid, with intent to manufacture methamphetamine, shall be deemed to be possession of hydriodic acid."

The Legislature's purpose in enacting section 11383(c)(2) and amending section 11383(f) was clearly stated in a report of the Assembly Committee on Public Safety: "Hydriodic Acid (HI) was a substance sought after by operators of illegal methamphetamine labs and has been the main reducing agent. Legislation in 1993 added HI as a controlled substance. The criminals have found a loophole with an HI substitute by purchasing large amounts of iodine

---

[16] Prior to 1995, section 11383 had been expanded (1) in 1987, by criminalizing the possession of several new chemical combinations used to manufacture methamphetamine and redesignating section 11383, subdivision (c) as section 11383, subdivision (e), the forerunner of section 11383(f) (see Stats. 1987, ch. 424, § 1, p. 1589); (2) in 1988, by adding more chemicals to the list of prohibited chemicals and redesignating section 11383, subdivision (e) as section 11383(f) (see Stats. 1988, ch. 712, § 3, p. 2363); (3) in 1992, by abandoning the requirement that ephedrine and pseudoephedrine had to be possessed in combination with other chemicals before such possession was criminal (see Stats. 1992, ch. 49, § 1, pp. 173–174); and (4) in 1993, by criminalizing the possession of substances containing ephedrine or pseudoephedrine (see Stats. 1993, ch. 1, § 1, p. 60).

and iodine crystals. *This bill would close that loophole by making it a felony to possess such substitutes with intent to manufacture methamphetamine.*" (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 419 (1995–1996 Reg. Sess.) as amended Mar. 28, 1995, p. 1, italics added.)

The manner of closing this loophole was also described in the report of the Senate Committee on Criminal Procedure: "This provision would make possession of iodine, for instance, with intent to manufacture methamphetamine, *as culpable as possession of the finished product.*" (Sen. Com. on Criminal Procedure, Rep. on Sen. Bill No. 419 (1995–1996 Reg. Sess.) Mar. 21, 1995, p. 6, italics added.) The report also stated: "This bill would provide that possession of any essential chemicals . . . sufficient to manufacture . . . methamphetamine are deemed to be possession of the precursor itself. Thus, possession of iodine, which is used to make hydriodic acid, *would be legally equivalent* to possession of hydriodic acid." (*Ibid.*, italics added.)[17]

### III.  CONCLUSION

The Legislature, by extending the prohibition on possessing hydriodic acid to include its essential chemicals, clearly intended to criminalize the possession of red phosphorus and iodine where these two chemicals are found in sufficient quantity to manufacture hydriodic acid and are possessed with intent to manufacture methamphetamine.

Accordingly, we reject defendant's contention that section 11383(f) creates an unconstitutional mandatory rebuttable presumption. Instead, the "shall be deemed" language of section 11383(f) simply expands the section 11383(c)(2) definition of hydriodic acid to encompass its essential chemicals and thus defines, in precise terms, the substantive crime of possession of the essential chemicals sufficient to manufacture hydriodic acid, in this case, red phosphorus and iodine, with intent to manufacture methamphetamine.

---

[17] Effective January 1, 2004, section 11383(f) was amended to read: "Any person who possesses immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . , with intent to manufacture methamphetamine, is guilty of a felony and shall be punished by imprisonment in the state prison for two, four, or six years." (Stats. 2003, ch. 619, § 1.) Section 11383, subdivision (g) now provides: "Any person who possesses essential chemicals sufficient to manufacture hydriodic acid or a reducing agent, with intent to manufacture methamphetamine, is guilty of a felony and shall be punished by imprisonment in the state prison for two, four, or six years." (Stats. 2003, ch. 619, § 1.)

## IV.   DISPOSITION

The judgment of the Court of Appeal is reversed only insofar as it reversed the conviction on count 3. The cause is remanded for the Court of Appeal to resolve any outstanding issues regarding count 3. In all other respects, the judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.