Filed 2/22/23  P. v. Rolon CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077799 |
| v. | (Super.Ct.No. FVA024272) |
| BLANCA ALMA ROLON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Reversed with directions.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier, Kathryn Kirschbaum and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2005, Blanca Alma Rolon pled guilty to possession of pseudoephedrine with intent to manufacture methamphetamine. (Health & Saf. Code, former § 11383, subd. (c)(1); see *id*., § 11383.5, subd. (b)(1).) In 2021, Rolon filed a motion pursuant to Penal Code section 1473.7 to vacate her conviction as "legally invalid due to prejudicial error damaging [her] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences." (Pen. Code, § 1473.7, subd. (a)(1); unlabeled statutory citations are to this code.) The trial court denied Rolon's section 1473.7 motion. We conclude that Rolon has demonstrated a reasonable probability that she would have rejected the plea had she correctly understood its immigration consequences, and we accordingly reverse.

BACKGROUND

Rolon was born in Guatemala, attended school only through the sixth grade, came to California at age 18 in 1987, and married Longinos Rolon, a United States citizen, that same year. They have been married for 35 years and have four children, all of whom are United States citizens. Rolon's parents and siblings are also all United States citizens. After she got married, Rolon applied for permanent residency and received a green card bearing her name and photograph.

On December 23, 2001, Rolon returned from a trip to Tijuana with her two nephews and presented the green card at the San Diego port of entry vehicle crossing. The border agent informed Rolon that the green card was not hers but rather had been issued to her twin sister, who is also named Blanca and also shares the same middle

2

initial. On the basis of that incident, Rolon was issued a notice to appear before the Executive Office for Immigration Review in San Diego. The notice to appear alleged that Rolon was subject to removal for having presented a resident alien card, not lawfully issued to her, as her own (8 U.S.C. § 1182(a)(6)(C)(i)), knowingly attempting to smuggle two minor children (Rolon's two nephews) into the United States (8 U.S.C. § 1182(a)(6)(E)(i)), and attempting entry into the United States without possessing a valid entry document (8 U.S.C. § 1182(a)(7)(A)(i)(l)). Rolon was subject to removal until she could show that she had mistakenly received her twin sister's green card. Rolon hired an immigration attorney in San Diego to fight the removal proceedings and allow her to continue seeking lawful permanent resident status. Rolon believed her immigration case was still pending at the time of the criminal charges at issue in this case.

In 2005, Rolon and her husband, Longinos,[1] were charged with one count of possession of marijuana for sale (Health & Saf. Code, former § 11359) and one count of possession of pseudoephedrine with intent to manufacture methamphetamine (*id*., former § 11383, subd. (c)(1)). Pursuant to a negotiated disposition, Rolon pled guilty to the latter offense in exchange for dismissal of the former offense and three years of formal probation with various terms and conditions, including a custodial term of 30 days in county jail that could be served under a work release program by performing community labor for the California Department of Transportation.

---

[1] For clarity, we refer to appellant as Rolon and to her husband by his first name, Longinos. No disrespect is intended.

3

On June 9, 2021, Rolon filed her motion to vacate the 2005 conviction pursuant to Penal Code section 1473.7, subdivision (a)(1). Rolon's motion claimed three distinct prejudicial legal errors: (1) Rolon's plea counsel failed to advise Rolon of the adverse immigration consequences of her plea, namely, that the conviction would prevent her from obtaining lawful permanent resident status and render her deportable, inadmissible, and ineligible for most forms of discretionary relief because it is both an aggravated felony (see 8 U.S.C. §§ 1101(a)(43)(B) & 1227(a)(2)(A)(iii)) and a controlled substances conviction (see 8 U.S.C. § 1227(a)(2)(B)(i)) under federal immigration law; (2) Rolon's plea counsel did not attempt any immigration-safe defense strategy, either by seeking a plea recognized at the time to be immigration-neutral or by exploring Rolon's substantial defenses to the charges; and (3) Rolon subjectively failed to understand the immigration consequences of her plea.

Rolon's motion was accompanied by declarations from Rolon, her husband, and her immigration attorney, and it included Rolon's pending application for a U-Visa, the 2001 notice to appear initiating removal proceedings against Rolon, the 2013 decision administratively closing her 2001 removal proceedings, excerpts from a 2004 criminal defense treatise advising counsel on strategies to defend against adverse immigration consequences for noncitizen defendants, and 31 letters of support from family, friends, and community members attesting to Rolon's character and her deep ties to the community.

4

The People filed opposition arguing that: (1) Rolon could not establish ineffective assistance of counsel because she had not complied with the requirements of section 1473.7, subdivision (g), that she provide her former plea counsel with timely advance notice of the hearing; (2) Rolon had in fact been advised that harsh immigration consequences could follow from her conviction because on her plea form she had initialed next to the admonition that "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization may result from a conviction of the offense(s) to which I plead guilty/nolo contendere (no contest);" and (3) Rolon could not establish prejudice because she was already deportable for being present in the country without documentation and because of her 2001 detention at the San Diego port of entry when removal proceedings were initiated for her alleged illegal entry, alien smuggling, and presentation of false documents.

The People's opposition included several pages of written objections to the evidence Rolon had submitted in support of her motion. They objected to the three declarations as inadmissible hearsay because they were unsworn statements not made under penalty of perjury and thus did not comply with Code of Civil Procedure section 2015.5.

At the hearing, the court stated that it tended to agree with the People's objections to the defective declarations, "particularly, Mr. [Longinos] Rolon's—I would not consider the declaration. It's not sworn. It's hearsay. If you want to present their

5

testimony, you're free to call them." Defense counsel inquired whether the court was willing to accept Mrs. Rolon's declaration, and the court replied, "I'm willing to accept it in the sense I'm going to note it wasn't sworn," adding that it "would probably be in the best interest to put her on the stand." Counsel then called Rolon to testify but did not present any testimony from Longinos and did not have Longinos cure the defect in his declaration by signing it under penalty of perjury.

Rolon testified that she could not remember much about the circumstances of the criminal charges to which she pled guilty in 2005. During a consensual search of the Rolons' residence in November 2004, police found some marijuana and pseudoephedrine pills. Rolon did not know why the police had come to search their home. She had never been arrested or charged with a crime before, had never been to criminal court, and did not understand the seriousness of what was happening at the time. She has never used drugs and has never smelled marijuana before. When the police arrived at their home, Rolon telephoned her husband, and he came home. Police told Rolon to stay inside the house while they went outside to question her husband. Rolon did not know what the police discussed with Longinos after the search, and it was not until later that Rolon became aware that police had found marijuana and pills in their house. Rolon was not arrested on the day of the search and was unsure whether her husband was arrested that day. Rolon's recollection was that at the time of her husband's court appearance, she was brought to court and charged because she also lived in the house where the drugs were found.

Rolon's confusion regarding whether and when she and her husband were arrested is borne out by conflicting information in the record. It was not until four months after the search that a felony complaint was filed on March 29, 2005, charging both Rolon and Longinos with one count of possession of marijuana for sale (Health & Saf. Code, former § 11359) and one count of possession of pseudoephedrine with intent to manufacture methamphetamine (*id*., former § 11383, subd. (c)(1)). The felony complaint lists both Rolon and Longinos as defendants, but the spaces provided for their booking numbers are blank, and the complaint requests that arrest warrants be issued for both defendants based on the "official reports and documents of a law enforcement agency" establishing probable cause "attached hereto and incorporated herein." No police report or other document, however, is attached to the felony complaint in the record on appeal, and nothing indicates that a warrant was issued for Rolon's arrest at the time the complaint was filed. The police report that appears elsewhere in the record states that Longinos arrived home shortly after the marijuana and pseudoephedrine pills had been found and immediately told the police the contraband belonged to him.[2] On the basis of Longinos's

---

[2] The trial court stated it would not consider statements contained in the police report because they are hearsay. An extrajudicial statement is hearsay only if it "is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Because Rolon's 2005 plea deal was reached before any preliminary hearing, we consider Longinos's statements to the arresting officer contained in the police report not for their truth but rather for their effect on Rolon's decision, had she understood the immigration consequences, whether to accept the plea offer. (See *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*) [a court deciding a section 1473.7 motion should consider evidence affecting a defendant's desire to go to trial or their hope or expectation of negotiating an immigration-neutral plea bargain]; *People v. Mejia* (2019) 36 Cal.App.5th 859, 872 (*Mejia*) [that record revealed "lingering questions about the strength of the underlying

*[footnote continued on next page]*

7

statements, the police report states that Rolon was not arrested, but Longinos was transported to West Valley Detention Center for booking on the same charges listed in the subsequently filed felony complaint. As the trial court stated at the section 1473.7 hearing, Rolon "was apparently never in custody for any of the court hearings. She was on her own recognizance from the date of arraignment through the plea."

Rolon testified that her husband was represented by Fred De la Peña, and after her first court appearance she was represented by Mary Jo De la Peña. The minute order from Rolon's arraignment lists her counsel as Fred De la Peña and states that Rolon waived the conflict of interest to allow her husband's attorney to represent her for purposes of arraignment but would retain her own counsel thereafter. Rolon's plea declaration was completed and signed by Rolon and by Fred De la Peña as Rolon's attorney on June 7, 2005, but the minute order for that date indicates the hearing was continued to June 23, 2005, because the court did not have a written conflict waiver on file to allow Fred De la Peña to represent both defendants.

Rolon did not recall either of the De la Peñas ever discussing the case with her before asking her to sign the plea declaration. Rolon never went to the De la Peñas' office to discuss the case with either of the lawyers before the plea was entered. She did not understand the seriousness of the situation she was in. She was not even aware that

_____

evidence" supported defendant's claim of prejudicial error]; *People v. Jung* (2020) 59 Cal.App.5th 842, 858 (*Jung*) [fact that criminal charges "'went beyond the available evidence'" supported claim of prejudicial error], disapproved on another ground in *Vivar*, at p. 526, fn. 4; *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 325-326 (*Rodriguez*) [record did not show defendant "was without any plausible defense" and therefore "may well have insisted" that any plea deal involve an immigration-neutral charge].)

8

she had pled guilty to charges related to the pills that were found, rather than the marijuana. Rolon told her attorney that she was not guilty. Neither of the attorneys ever asked Rolon if she knew about the drugs, discussed the possibility of fighting the charges, asked Rolon about her immigration status, or explained what would happen to her when she pled guilty. When Rolon pled guilty, she had lived more than half of her life in the United States married to a United States citizen and was raising four United States citizen children ages five to 17, all of whom were living at home. She pled guilty because her attorney told her she would not go to jail if she did, and she would go to jail for many years if she did not. She felt that she had to plead guilty in order to stay with her children, who were young at that time. She had no understanding when she entered her guilty plea that it would have any effect on her immigration status.

It was only after Rolon had completed three years of probation, completed the work release program "cleaning the freeways," complied with all of the probation terms and conditions, and "done everything that was requested of [her] on probation" that she was informed, at her final meeting with her probation officer, that she would be deported. Had she understood the immigration consequences of the plea, she would not have pled guilty but would have fought the charges against her. She would have been willing to go to jail if that were necessary to avoid the adverse impact on her immigration status.

After Rolon successfully completed her 36-month probation term and was informed of the immigration consequences, she tried to do everything she could to mitigate the immigration consequences and have her criminal case "erased." In 2010,

9

Rolon hired counsel who successfully petitioned to have her conviction reduced to a misdemeanor and expunged pursuant to section 1203.4. Expungement, however, does not eliminate the conviction for federal immigration purposes and does not prevent deportation based on the expunged conviction. (*Ramirez-Castro v. I.N.S.* (9th Cir. 2002) 287 F.3d 1172, 1174-1175.) Also around 2010, Rolon went to speak with her plea counsel, Mr. De la Peña, to get a copy of her defense file, but she was told that he did not have any records. At some point thereafter, Rolon made another appointment to meet with Mr. De la Peña and was again informed that he did not have any records related to her case. In 2012, Rolon successfully moved the Board of Immigration Appeals to reopen the removal proceedings stemming from the 2001 incident where she had mistakenly presented her twin sister's green card at the San Diego border crossing, and those removal proceedings were closed in 2013. In 2014, Rolon filed a motion to vacate her conviction under Penal Code section 1016.5, but the motion was denied because her plea form contains substantially the same admonition set forth in that provision. In 2015, she applied for a U-Visa, a temporary nonimmigrant visa available to noncitizens who provide assistance in the investigation and prosecution of certain serious crimes in which they have been victimized. (See 8 U.S.C.S. § 1101(a)(15)(U); *Fonseca-Sanchez v. Gonzales* (7th Cir. 2007) 484 F.3d 439, 442, fn. 4.) Her U-Visa application remains pending, but her 2005 criminal conviction significantly reduces the likelihood that it will be granted because she must also obtain a discretionary waiver of inadmissibility. (See 8 U.S.C.S. § 1182(d)(3)(A); 8 C.F.R. § 212.7.) In 2020, Rolon successfully obtained a

certificate of rehabilitation, and her application for a pardon remains pending with the governor's office. (See Pen. Code, § 4852.01 et seq.)

The presentence probation report states that Rolon "was interviewed in person on July 14, 2005[,] and stated that none of the drugs found at the house were hers." "The defendant stated that she did not know anything about the drugs and that her husband had placed the drugs there the night before the arrest." "She denies any alcohol or drug use and only pleaded guilty to the charge[] because she did not want to run the risk of getting more time[: ] 'I need to take care of my kids.'" The presentence report states that Rolon "does not have a prior record of criminal conduct," that she "was induced by others to participate in the crime," that Rolon's four children were then ages "5, 11, 15, and 17," and that imprisonment "will seriously affect" Rolon's dependents.

Rolon also told the probation officer that she had lived in the United States "for the past 17 years" but lacked documentation and was "going to [immigration] court for deportation matters, where she claims she was confused with her twin sister." The probation officer contacted the Department of Homeland Security and was informed that Rolon had been detained "for attempting illegal entry into the United States, alien smuggling and having an imposter alien card." The probation department accordingly recommended that her conditions of probation include that Rolon "[n]ot remain in, or reenter, the United States without proper written authorization by the Department of Homeland Security—Bureau of Citizenship and Immigration Services" and that "[u]pon

11

reentering the United States, [Rolon] report forthwith to the probation officer with written proof of said authorization."

After hearing Rolon's testimony, the trial court heard argument from both counsel. During argument, Rolon's counsel explained that she had "attempted to find out from [Rolon's] defense counsel, Mr. and Ms. De la Peña, what they did or did not do in terms of this advisement and defending against immigration consequences. They had no record of ever representing her. [¶] I do apologize, I should have done this earlier. In the event the Court is concerned about that issue, I have a declaration of our paralegal, along with emails back and forth from the De la Peña law firm where they insisted—even though [they] had the minute orders—that they never represented her at all." The People then objected "to the Court considering the declaration, which does not appear to comply with hearsay emails attached to it." The court did not rule on the People's objection. Nevertheless, Rolon's counsel did not introduce into evidence the declaration with the attached email correspondence from Rolon's plea counsel, and it is not in the record on appeal.

After hearing argument from counsel, the trial court stated that "some of [Rolon's] testimony, quite honestly, was contradicted by documents in the court file." The court explained that documents indicated that Rolon "was assisted by a certified Spanish interpreter at the time of her court appearances and at the time of the plea," and the interpreter signed Rolon's plea declaration, but "[a]t the time of the plea she testified that nobody translated it for her, which I think would be false." It is unclear what testimony

12

the court was referring to in this statement because no transcript of Rolon's plea hearing appears in the record, neither attorney referred to testimony at the plea hearing, and nothing in Rolon's testimony at the motion hearing or in her declaration asserted that her plea form was not translated. The court also stated that "the advisal regarding deportation consequences was initialed by the defendant on the plea form." The court further stated that Rolon's having assembled "letters of reference and all the support letters," having the conviction expunged, and obtaining a certificate of rehabilitation "suggest[] she is more familiar with the system than some of her testimony." The court also stated that the second condition of Rolon's probation "was immigration terms" that she not remain in or reenter the country without authorization, which indicated that "[c]learly that was known at the time all this was happening."

The court stated further that it did not find Rolon's testimony persuasive: "But, again, her whole statement in here in court has been she didn't know how she got the attorneys. They were private lawyers. She didn't remember talking to them. She didn't remember talking to the probation officer. She didn't know anything about the case, anything about the drugs, anything about her husband. But somehow she manages to retain counsel, come in and pled guilty to a felony, even with the significant advisal documented in the case file and significant statements documented in the probation report." The court found Rolon had not carried her burden of establishing prejudicial error by a preponderance of the evidence.

13

The court also stated that Rolon's plea counsel, Mr. De la Peña, "is not here, has not been given an opportunity to discuss these issues. In any event, I'm not going to find ineffective [assistance of counsel] based on the speculative, silent record in this hearing." After Rolon's counsel informed the court that she had never alleged ineffective assistance of counsel, the court responded that "[o]ne of your grounds is he did not research and advise her of any immigration consequences. That's all speculative. [¶] . . . [¶] . . .You're wanting me to speculate that he did not research or advise her of the immigration consequences and he did not attempt to seek an immigration[-]safe alternative defense, there's no evidence of that, at all." The court then denied Rolon's motion.

## DISCUSSION

Rolon argues the trial court erred by denying her motion to vacate her conviction, because she established by a preponderance of the evidence prejudicial error damaging her ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of her plea. We agree.

A. *Governing Law*

Section 1473.7 provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction or sentence" if the "conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity

14

may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) "The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a). For a motion made pursuant to paragraph (1) of subdivision (a), the moving party shall also establish that the conviction or sentence being challenged is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (e)(1).) "When ruling on a motion under paragraph (1) of subdivision (a), the only finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (e)(4).)

The statute was amended in 2018 to "clarif[y] that successful immigration-related petitions did not have to hinge on ineffective assistance of counsel claims—a requirement that had been read into the first version of the section by reviewing courts." (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 768 (*Alatorre*).) In the 2018 amendments, the Legislature declared that section 1473.7 "shall be interpreted in the interests of justice and consistent with the findings and declarations made in Section 1016.2 of the Penal Code." (Stats. 2018, ch. 825, § 1, subd. (c).) Those findings declare the legislative intent to codify United States Supreme Court and related California case law that recognizes the obligation of defense counsel to investigate, defend against, and advise noncitizen clients

15

about potential adverse immigration consequences and encourages "the consideration of immigration consequences by both parties in the plea negotiating process." (§ 1016.2, subds. (a) & (b).) The findings also express legislative intent "to encourage the growth of such case law in furtherance of justice." (§ 1016.2, subd. (h).) Of particular relevance here, the Legislature also made findings and declarations regarding the impact of the immigration consequences of criminal convictions in California, where "[o]ne out of every two children lives in a household headed by at least one foreign-born person. The majority of these children are United States citizens. It is estimated that 50,000 parents of California United States citizen children were deported in a little over two years. Once a person is deported, especially after a criminal conviction, it is extremely unlikely that he or she ever is permitted to return." (§ 1016.2, subd. (g).)

"The key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken, and not whether their attorney technically provided [ineffective assistance of counsel]." (*Mejia*, *supra*, 36 Cal.App.5th at p. 866.) As amended, section 1473.7 makes clear that a conviction is legally invalid if the defendant establishes their own prejudicial error "in not knowing that [the] plea would subject [them] to mandatory deportation and permanent exclusion from the United States." (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1009 (*Camacho*).)

"[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if

16

the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. [Citation.] Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, *supra*, 11 Cal.5th at pp. 529-530.) Other relevant factors include the defendant's remaining ties (or lack thereof) to their home country (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 912 (*Manzanilla*)), the defendant's immigration status at the time of the plea (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 80-81 (*Ogunmowo*)), the defendant's criminal record and familiarity with the criminal justice system at the time of the plea (*People v. Lopez* (2022) 83 Cal.App.5th 698, 718 (*Lopez*); *Camacho*, *supra*, 32 Cal.App.5th at p. 1011), the strength of the prosecution's case relative to the defendant's (*People v. Martinez* (2013) 57 Cal.4th 555, 564; *Rodriguez*, *supra*, 68 Cal.App.5th at p. 325), the severity or sophistication of the offenses charged (*Mejia*, *supra*, 36 Cal.App.5th at p.873; *Jung*, *supra*, 59 Cal.App.5th at p. 858), and evidence of the defendant's state of mind and response upon eventually learning of the plea's immigration consequences. (*Vivar*, at pp. 530-531; *Lopez*, at p. 716.) In assessing prejudice, we focus on "'what the defendant would have done, not whether the defendant's decision would have led to a more favorable result.'" (*Vivar*, at pp. 528-529.)

17

"A 'reasonable probability' 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329-330.) A reasonable probability is "a significant but something-less-than-50 percent likelihood." (*People v. Howard* (1987) 190 Cal.App.3d 41, 48.)

To establish prejudice, defendants must do more than merely state they would not have accepted the plea had they correctly understood its immigration consequences; such claims should be corroborated by objective, contemporaneous facts. (*Vivar*, *supra*, 11 Cal.5th at p. 530.)[3]

In reviewing a trial court's ruling on a section 1473.7 motion, we exercise our independent judgment to determine whether the facts satisfy the rule of law. (*Vivar*, *supra*, 11 Cal.5th at p. 527.) Factual determinations that are based on the credibility of witnesses the trial court heard and observed are entitled to particular deference, although our conclusions after independent examination of the evidence may differ from the trial court's, even if the evidence is in conflict. (*Ibid.*) "Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Id.* at p. 528.)

---

[3] Objective evidence of a defendant's ties to the United States "includes facts provided by a defendant's declaration or declarations from family members, friends, colleagues, community members, or other acquaintances." (*People v. Espinoza* (Jan. 26, 2023, S269647) __Cal.5th __ [2023 Cal.Lexis 254, at *14].)

B.    *Analysis*

The offense to which Rolon pled guilty in 2005, possession of pseudoephedrine with intent to manufacture methamphetamine in violation of Health and Safety Code former section 11383, subdivision (c)(1), is an "aggravated felony" under federal immigration law.  (*Lopez-Jacuinde v. Holder* (9th Cir. 2010) 600 F.3d 1215, 1216, fns. 1 & 2.)  "Mandatory removal from the United States is a consequence of being convicted of a crime deemed an aggravated felony under federal immigration law.  [Citations.]  An aggravated felony conviction further renders a defendant ineligible for relief from deportation, such as asylum and cancellation of removal.  [Citation.]" (*Manzanilla*, *supra*, 80 Cal.App.5th at p. 904.)

Rolon introduced uncontradicted evidence that she was not informed by her attorneys that her plea would result in her mandatory deportation and would prevent her from obtaining permanent residency.  Rolon testified that her attorneys never asked about her immigration status and never discussed her defenses to the charges or the possibility of an immigration-neutral plea deal.  She had never been charged with a crime before, had never been to criminal court, and had no familiarity with the process.  Rolon also testified that she had "never used drugs in [her] life," had never smelled marijuana before, and "had nothing to do with the drugs" found in the home.  Rolon claimed that she did not understand that she had pled guilty to the charge related to the pills rather than the marijuana.  According to Rolon, she told Mr. De la Peña that she was not guilty, and he never asked Rolon if she knew about the drugs or discussed the possibility of

19

fighting the charges. He told her to plead guilty and that if she did not accept the plea deal, she "would go to jail for many years." Rolon explained that she pled guilty "because [her] children were young at the time and [she] did not want to leave them alone." Rolon testified that she did not understand that her plea would have any effect on her immigration status.

It was not until three years later, at Rolon's final meeting with her probation officer, that she learned she was subject to deportation and ineligible for permanent residency because of her 2005 conviction. After being informed of the immigration consequences of her plea, Rolon became depressed and reluctant to leave the house for fear she would be detained by immigration authorities. Nevertheless, she "tried everything [she] could to do something about this conviction" and remain in the country with her family. Rolon hired a new attorney, who had her conviction expunged in 2010. That same year, she contacted her former counsel to obtain her 2005 case file but was informed they had no records. She retained new immigration attorneys who succeeded in having her 2001 removal proceedings reopened in 2012 and administratively closed in 2013. Rolon unsuccessfully moved to withdraw her plea and vacate her conviction under section 1016.5 in 2014. She applied for a U-Visa in 2015, and that application is pending but is hindered because the 2005 conviction makes her inadmissible. In 2020, Rolon obtained a certificate of rehabilitation and recommendation for pardon. Thereafter, she filed the instant motion to vacate the plea under section 1473.7.

Had Rolon understood the immigration consequences, she would have fought the charges and would have been willing to go to jail in order to avoid a conviction that would bar her from permanent residency. As in *Vivar*, *supra*, 11 Cal.5th at p. 530, Rolon's claim that avoiding deportation was of paramount importance is corroborated by the "contemporaneous objective facts" establishing Rolon's deep ties to the United States. When she pled guilty, Rolon had been living in the United States for more than 18 years—the majority of her life. She had been married to a United States citizen for 18 years and was caring for their four young children, all of whom were also United States citizens; her parents and siblings are also United States citizens. Rolon had applied for permanent resident status, had hired an immigration attorney to correct the mistake involving her twin sister's green card and allow Rolon to obtain permanent residency, and believed those proceedings were ongoing at the time of the plea. (See *Ogunmowo*, *supra*, 23 Cal.App.5th at pp. 78-79 [defendant's effort to secure and preserve his permanent resident status before he entered plea showed importance he placed on remaining in the United States].) Rolon's claim that she did not meaningfully understand the immigration consequences of her plea is also bolstered by the evidence that she had no prior criminal record, had never been to criminal court before, and had only attended school through the sixth grade. (See *Lopez*, *supra*, 83 Cal.App.5th at p. 718.)

Her contentions are also supported by her contemporaneous statements to the probation officer that "she did not know anything about the drugs" and "only signed the plea agreement" to avoid significant jail time because "[s]he needs to be there for her

21

kids," as well as her explanation that she lacked documentation and "is also going to [immigration] court for deportation matters [because] she claims she was confused with her twin sister." Had Rolon understood then that her plea subjected her to mandatory deportation that would permanently separate her from her children, she would not have characterized the plea agreement as allowing her to remain home to take care of her children. Had she understood that the plea prevented her from obtaining her green card, she would not have "stated that she is going to [immigration] court . . . because there was a misunderstanding between her twin sister and her." That description instead reflects Rolon's understanding at that time, as she testified at the hearing, that (1) the 2001 notice to appear was the result of a mix-up with her sister, who shares the same first name, middle initial, maiden name, and date of birth, (2) Rolon would no longer be subject to deportation once she proved that a mistake had been made, (3) she had retained immigration counsel for that purpose, and (4) she believed the process was ongoing when she entered her plea and when she was interviewed by the probation officer. (See *People v. Soto* (2022) 79 Cal.App.5th 602, 611 (*Soto*) [presentence report contained contemporaneous evidence that defendant did not want to be deported].) Indeed, those removal proceedings were reopened in 2012 and administratively closed in 2013, but her 2005 conviction continues to prevent Rolon from obtaining a green card.

In addition, the importance Rolon placed on protecting her ability to remain in the United States with her husband, four children, and extended family is also corroborated by her subsequent actions upon learning that her 2005 conviction rendered her removable

22

and inadmissible.  (See *Lopez*, *supra*, 83 Cal.App.5th at p. 716; *Vivar*, *supra*, 11 Cal.5th at pp. 530-531.)  She hired criminal defense counsel who had the conviction expunged, obtained a certificate of rehabilitation and pardon recommendation, and unsuccessfully sought to vacate the conviction.  She also retained new immigration lawyers to reopen and administratively close the 2001 removal proceedings and apply for a U-Visa.  On the basis of our independent review of the record and consideration of the totality of the circumstances, we conclude that Rolon has shown prejudicial error damaging her ability to meaningfully understand the immigration consequences of her plea.

The trial court's denial of Rolon's motion rested on a number of errors.  First, the court attributed great significance to the fact that on the plea form Rolon checked the box and initialed next to the following immigration advisement:  "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization may result from a conviction of the offense(s) to which I plead guilty/nolo contendere (no contest)."  As our Supreme Court pointed out in *Vivar*, however, the standard advisement in a plea form that "deportation was a possibility" has no bearing on a claim of prejudicial error under section 1473.7 for a defendant like Rolon, who had extensive ties to the United States and pled guilty to an aggravated felony without being aware of the "crucial fact" "that deportation in these circumstances was mandatory."  (*Vivar*, *supra*, 11 Cal.5th at p. 533; see *Lopez*, *supra*, 83 Cal.App.5th at pp. 716-717; *Manzanilla*, *supra*, 80 Cal.App.5th at p. 906; *Soto*, *supra*, 79 Cal.App.5th at

23

p. 609.) The People concede the point and expressly disclaim any reliance on the immigration advisement in Rolon's plea declaration.

The trial court also erroneously relied on the fact that Rolon's probation terms included a condition that she not remain in or reenter the United States without written authorization. That condition was not imposed until the sentencing hearing more than a month after the court had accepted Rolon's guilty plea. It therefore tells us nothing about Rolon's understanding of the immigration consequences at the time she entered her plea.

Similarly, the trial court erroneously concluded on the basis of Rolon's actions after learning about the plea's immigration consequences—successfully seeking expungement and a certificate of rehabilitation, as well as assembling 31 letters of support—that Rolon "is more familiar with the system than" she stated in her testimony. Rolon's conduct years after pleading guilty has no tendency to prove that she was "familiar with the system" when she pled. Rather, Rolon's retention of both criminal defense attorneys and immigration attorneys to pursue every available possible remedy is further evidence showing the importance she placed on her ability to remain in the country. (See *Vivar*, *supra*, 11 Cal.5th at pp. 530-531; *Lopez*, *supra*, 83 Cal.App.5th at p. 716.) It proves nothing about her understanding of the criminal justice system and the immigration consequences of her guilty plea when she entered it, and the trial court misconstrued the evidence by concluding otherwise.

In addition, the trial court stated that it found "not particularly credible" Rolon's "lack of memory and denial of any culpability" for the offense "to which she pled guilty

24

at the first appearance." The court stated that Rolon had "obviously[] retained counsel. Mr. De la Peña signed the plea form. [¶] . . . She doesn't remember talking to the attorney. She doesn't remember what their advice was." The court stated that Rolon's "whole statement in here in court has been she didn't know how she got the attorneys. They were private lawyers. She didn't remember talking to them." "She didn't know anything about the case, anything about the drugs, anything about her husband. But somehow she manages to retain counsel, come in and pled guilty to a felony, even with the [section 1016.5] advisal documented in the case file and significant statements documented in the probation report." Again, the trial court's analysis misconstrues Rolon's testimony and other evidence in the record.

First, Rolon did not testify that "she didn't know how she got the attorneys." Rolon testified that initially she "didn't have a court date. The only one that had a court date was my husband." Rolon was brought to court by police on "the date that my husband had his court hearing." At that first appearance, Rolon had not retained counsel, which is not surprising given that she was not arrested at the time of the search, had not been ordered to appear, and only learned after having been brought to court that she was being charged as her husband's codefendant "because [she] lived in that house" where the drugs were found. Rolon's declaration states that she and her husband "hired a private attorney at the second hearing" to represent Rolon, and she testified that she was represented by Ms. De la Peña, who was not present at her first court appearance—all of which is consistent with the court's minute orders.

25

Second, Rolon did not testify that she did not remember ever speaking to her attorneys. Rolon's declaration states: "The only time I spoke to the attorney was when I told him that I was not guilty." She testified that she did not go to their law office to discuss the case (until years later when she went twice to try to obtain her file), she only saw her attorney in court, and she went to court "two or three" times.

Third, Rolon did not testify that she could not recall any advice her attorneys gave her. Her declaration states: "At the last hearing, my attorney recommended that I plead guilty, because if not, I would go to jail for many years." At the hearing, Rolon likewise testified that she decided to plead guilty because her attorney told her she risked going to jail if she did not accept the plea offer.

Fourth, Rolon did not plead "guilty at the first appearance." The minutes of Rolon's first appearance state "defendant waives conflict of interest for purposes of arraignment" (capitalization omitted) to allow Mr. De la Peña, who was already present representing Rolon's husband, to represent her at arraignment. The minutes of Rolon's arraignment also state, "defendant to retain own counsel" and "defendant pleads not guilty to all counts" (capitalization omitted). As previously stated, both Rolon and Mr. De la Peña signed her plea declaration on June 7, 2005, the date set for pre-preliminary hearing, but the minutes for that hearing state: "No written waiver of conflict on file. Court will not take plea without written waiver of conflict. [¶] . . . Hearing continued to 6-23-2005" (capitalization omitted). Consistent with Rolon's testimony, the record

26

indicates that Rolon's guilty plea was entered on her third appearance, at the continued pre-preliminary hearing on June 23, 2005.

Fifth, for reasons we have already explained, the trial court's reliance on the section 1016.5 advisal in the plea declaration and unspecified "statements documented in the probation report" was erroneous. The advisal in the plea declaration was inadequate as a matter of law (*Soto*, *supra*, 79 Cal.App.5th at p. 609), and Rolon's testimony was consistent with and actually supported by her statements in the probation report (*id*. at p. 611).

In addition, the trial court erred by repeatedly indicating that Rolon was required to prove ineffective assistance of counsel because her motion included allegations that her attorneys had not advised her of the plea's immigration consequences and had failed to negotiate an immigration-neutral alternative. The People attempt to defend the trial court's erroneous imposition of the requirements for proving ineffective assistance, arguing on appeal that Rolon's petition "amounts to an ineffective assistance of counsel claim" and therefore requires that she satisfy both the statutory requirement of providing advance notice of the hearing to plea counsel (§ 1473.7, subd. (g)) and the two-step test for constitutionally deficient counsel established in *Strickland v. Washington* (1984) 466 U.S. 668, 687-688. The argument conflicts with the plain language of the statute, which was amended in 2018 to clarify that a court "need not" make a finding of ineffective assistance of counsel in order to find the plea legally invalid. (§ 1473.7, subd. (a)(1).) The argument also is contrary to the numerous appellate court decisions that have "come

27

to recognize both (1) errors of counsel that did not amount to constitutionally deficient representation and (2) the 'defendant's own error' as potential bases for claims." (*Alatorre*, *supra*, 70 Cal.App.5th at p. 768; see *Camacho*, *supra*, 32 Cal.App.5th at p. 1009; *Mejia*, *supra*, 36 Cal.App.5th at pp. 873-874; *People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1066; *Jung*, *supra*, 59 Cal.App.5th at p. 856; *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 310-312.)  The cases make clear that even where "the motion to vacate is fundamentally based on errors by counsel, the moving party need not" prove ineffective assistance of counsel in order to prevail.  (*Lopez*, *supra*, 83 Cal.App.5th at p. 709.)  Against that overwhelming and unanimous authority, the People cite no authority for their argument that Rolon must be held to the test for ineffective assistance of counsel notwithstanding her express disavowals of any such claim, both in her motion and at the hearing.  We accordingly reject the argument.

Because Rolon does not assert any claim of ineffective assistance of counsel, the trial court's concern that Rolon's former plea counsel was not given notice of the hearing, "is not here, [and] has not been given an opportunity to discuss these issues" is misplaced.  Rolon's counsel explained at the hearing that she had indeed attempted to find out from the De la Peña law firm "what they did or did not do" in terms of advising Rolon and defending against the immigration consequences, and counsel presented the trial court with emails in which the firm stated it had no record of ever representing Rolon.  Although those emails are not in the record, Rolon's declaration recounts that she twice went to the De la Peña law firm to get a copy of her file and was told they had no

28

records.  The People contend that even if the De la Peñas did not recall Rolon's case, "they still could have testified to their custom and practice for discussing immigration consequences with clients in 2005."  Testimony from a defendant's former plea counsel, however, is not necessary for a defendant to prevail on a section 1473.7 motion.  Such a requirement "would impose a condition on obtaining relief under section 1473.7 that is not contained in the statute.  The court can certainly consider what evidence is or is not in the record, but there is no litmus test requiring that the original defense counsel agrees they failed to adequately negotiate on behalf of their client." (*Manzanilla*, *supra*, 80 Cal.App.5th at p. 909; see *Lopez*, *supra*, 83 Cal.App.5th at pp. 718-719.)  The question presented by a section 1473.7 motion is not what plea counsel told the defendant, but what the defendant's "understanding was about the immigration consequences of her plea[]." (*Jung*, *supra*, 59 Cal.App.5th at p. 858.)

The People's remaining arguments are equally unavailing.  They argue that Rolon was seeking by her plea to avoid jail time rather than to avoid deportation, and they claim that she admitted as much in her statements to the probation officer in the presentence report.  The argument is undermined by Rolon's stated explanation for why she sought to avoid jail time—because she needed to care for her young children.  The probation report notes that Rolon's four children were then ages 5, 11, 15, and 17.  The report notes Rolon's statements that the drugs were not hers, that she knew nothing about the drugs, and that she signed the plea deal only because she wanted to avoid getting more time, and it then states:  "She needs to be there for her kids."  The report then quotes Rolon's

29

explanation for having pled guilty: "'I need to take care of my kids.'" That cannot reasonably be interpreted, as the People urge, as evidence that Rolon "placed little importance on avoiding deportation," which would permanently separate Rolon from her children, all of whom are United States citizens. (*Rodriguez, supra*, 68 Cal.App.5th at p. 326.)

The People similarly argue that Rolon's statements that she did not know there were drugs in the house and did not learn that marijuana and pills had been found until after her husband's arrest are contradicted by a statement in the presentence report that Rolon "stated she knew where the drugs were, because she saw her husband place[] the drugs there the day before the arrest." The People contend that the statement means Rolon "knew about the drugs the day before the search." But that statement in the report is merely a paraphrase of something that Rolon said, in Spanish, when she was interviewed. Consistent with Rolon's testimony, she may have seen her husband place something in the location where she later learned the marijuana and pills were found, and when probation interviewed her seven months later she understood that she had seen her husband place the drugs there the day before they were seized. That interpretation is supported by the next sentence in the report, which is not a paraphrase but rather a quote from Rolon: "'I did not know anything.'" We consequently do not read the probation officer's paraphrase of Rolon's earlier statement as contradicting Rolon's testimony. We thus disagree with the People's claim that the statement reveals the "essential inconsistency in [her] story" and renders Rolon's actual sworn testimony "self-serving"

30

and "not trustworthy," especially given that the People's interpretation of the statement was never mentioned in the trial court and the statement was not used for impeachment during Rolon's cross-examination. Moreover, the People do not mention that the same report contains the following statement that would appear nonsensical if interpreted in the same manner: "The defendant stated that she did not know anything about the drugs and that her husband had placed the drugs there the night before."

Finally, the People contend that Rolon could not have had any expectation of obtaining either an immigration-neutral plea deal or a more favorable outcome at trial. We disagree. First, as our supreme court pointed out in *Vivar*, the focus is on what the defendant would have done had they properly understood the immigration consequences, not whether a more favorable outcome was attainable. (*Vivar*, *supra*, 11 Cal.5th at p. 528.)

Second, in support of the argument, the People compare the terms of the plea deal with imprisonment for up to six years, which they describe as "the probable consequences of appellant proceeding to trial." The People do not explain why conviction would have appeared probable even though Rolon was not arrested when the drugs were discovered and was immediately offered a plea deal with no actual incarceration. The People also do not explain why Rolon would have appeared likely to be sentenced to several years' imprisonment despite her lack of any criminal record and minimal participation. The evidence against Rolon appeared weak. Although Rolon stated her understanding that she was charged because she lived in the house where the

31

drugs were found, a conviction for even simple unlawful possession of the marijuana would have required the prosecution to prove in addition not only that Rolon "knew of its presence" but also that she "*knew of its nature as a controlled substance.*" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 956 (*Tripp*).) "'Mere proof of opportunity of access to a place where narcotics are found will not support a finding of unlaw[f]ul possession. [Citation.]'" (*Ibid.*) The same element, knowledge of the substance's narcotic or controlled character, also must be proved for any conviction for selling, transporting, cultivating, or manufacturing a controlled substance. (*People v. Coria* (1999) 21 Cal.4th 868, 874-875.) For defendants such as Longinos, proof can be established directly by his statements to the arresting officer acknowledging that he knew the character of the substances he admitted were his and knew that his possession of them was illegal. Proof can also be established by substantial evidence from which it can reasonably be inferred that the defendant was familiar with the substance's narcotic character, such as prior drug-related convictions, possession of paraphernalia, or evidence showing consciousness of guilt. (*Tripp*, at p. 956.) The People point to no such evidence here. Longinos spontaneously told the police the drugs belonged to him, and Rolon consistently denied knowing the drugs were present, denied any drug use, and denied even knowing what marijuana smells like. The record thus suggests that Rolon had a substantial defense to the charge of possession for sale of the marijuana.

Rolon appears to have had an even stronger defense to the charge of possession of pseudoephedrine with intent to manufacture methamphetamine. On June 20, 2005,

32

three days before Rolon entered her plea, the California Supreme Court decided *People v. Perez*, significantly narrowing the scope of Health and Safety Code former section 11383. (*People v. Perez* (2005) 35 Cal.4th 1219 (*Perez*).) The court held that, because the Legislature used the phrase "'intent to manufacture methamphetamine'" instead of "'intent that methamphetamine be manufactured,'" a violation requires proof that the defendant not only possessed the specified precursor chemicals but also intended to use them to participate personally in the manufacturing process. (*Id.* at p. 1228.) The court found its interpretation to be consistent with the legislative scheme, legislative history, and legislative intent to shut down manufacturing laboratories and not the manufacturer's suppliers. (*Id*. at pp. 1229-1231.) As a result, the defendant in *Vivar*, who was charged with violating the same statute in 2002 after he was arrested trying to steal 12 boxes of Sudafed from a grocery store and told police "that he planned to provide the Sudafed to someone who would manufacture methamphetamine and, in turn, share some of the finished product with him," could not be convicted of the substantive offense absent evidence of his intended personal participation in the manufacturing process. (*Vivar*, *supra*, 11 Cal.5th at p. 518.)

Here, there is no significant evidence that Rolon knew the tablets were present in the home or knew that they contained pseudoephedrine. There is no evidence that Rolon had any knowledge of how to manufacture methamphetamine from pseudoephedrine, had access to the equipment and chemicals needed to do so, or knew anybody having the knowledge and equipment with whom she could personally participate in the

33

manufacturing process. Nor is there evidence she had ever used methamphetamine or even knew what it was—she had no history of any involvement with drugs or crime. Contrary to the People's argument, Rolon had substantial defenses to the charges that would have increased her desire to go to trial or her expectation of negotiating an immigration-neutral plea. (See *Rodriguez*, *supra*, 68 Cal.App.5th at pp. 325-326; *Jung*, *supra*, 59 Cal.App.5th at p. 858.)

For all of these reasons, based on our independent review and considering the totality of the circumstances, we conclude that Rolon has established it was reasonably probable that she would have rejected the plea offer had she meaningfully understood its immigration consequences. We therefore have no need to address Rolon's argument in the alterative that counsel provided ineffective assistance by failing to submit an amended declaration from her husband executed under penalty of perjury.

### DISPOSITION

The order denying the motion is reversed. The matter is remanded to the superior court with directions to grant the motion and vacate the conviction.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____

J.

We concur:

MILLER _____

Acting P. J.

FIELDS _____

J.

34